**STATE**

v.

**Charles PONA.**

No. 2005–95–C.A.

Supreme Court of Rhode Island.

June 15, 2007.

Aaron L. Weisman, Esq., Providence, for Plaintiff.

Paula Lynch, Esq., for Defendant.

Present: WILLIAMS, C.J., and GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Chief Justice WILLIAMS, for the Court.

The defendant, Charles Pona (defendant), appeals his Superior Court conviction for first-degree murder, carrying a pistol without a license, and attempted arson. All charges stemmed from the senseless, random killing of Hector Feliciano in August 1999. For the reasons set forth herein, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

Just before 5 p.m. on Saturday, August 28, 1999, seventeen-year-old Hector Feliciano was working on a recently purchased used car in a vacant lot behind the tenement house he shared with his mother and older brother, Carlos Echevarria, on Congress Avenue in Providence. The events that followed were hotly contested at defendant's criminal trial.

Hilda Carrasco lived in the first-floor apartment of 96 Hamilton Street, a tenement that was separated from the vacant lot by a chain-link fence. Carrasco testified that between 4 and 5 p.m., she was watching television in her living room. She glanced out her window and saw a dark blue and black vehicle that resembled a Blazer approach her apartment building from Congress Avenue and drive in reverse halfway into her driveway. Reluctantly, Carrasco admitted that she saw two males, one with dark skin, seated in both the vehicle's driver and passenger seats, but she vehemently denied being able to identify either man. Believing the vehicle was associated with someone from an upstairs apartment, Carrasco returned to watching television. She testified that a few minutes later, she heard three gunshots. She gathered the courage to look out the window again and saw the vehicle drive away, taking a right out of her driveway. Carrasco managed to see the vehicle's license plate number, which she recalled at trial as PS–977.

Eddy Remy was working in his driveway across the street from the vacant lot. Remy testified that at about 5 p.m., he heard two gunshots. When he turned to look, he saw a man in the vacant lot jump over the chain-link fence into Carrasco's driveway. According to Remy, the man was young, eighteen to twenty years old, had dark skin, was wearing blue jeans and a dark shirt, and had short hair.

Echevarria, Feliciano's older brother, was in his bedroom in the second-floor apartment at 87 Congress Avenue at approximately 5 p.m. on the day of Felici-

ano's murder. When he heard gunshots, he ran to the kitchen and looked out a window, where he saw a blue, new-model Blazer with tinted windows pulling out of a driveway. Unaware that the gunshots and presence of the Blazer were connected, he sat back down on his bed. It was only when a friend yelled that his brother had been shot that he ran downstairs to the adjacent vacant lot, where he found his brother lying in a pool of blood. The police already had arrived.

Jennifer Rivera lived at 95 Congress Avenue; she was the only witness able to identify defendant as the man running from the murder scene. Her prior testimony at defendant's November 15, 1999 bail hearing was played for the jury at trial.[1] At about 4:30 p.m., she was cooking in her kitchen when she heard gunshots. She looked out the window toward the vacant lot and saw a man hop a fence, get in the driver's seat of a gray Jeep, and drive away. She described this man as black, young—approximately twenty-one years old—about five feet, nine inches tall, with a short, "fade" haircut. Three days later at the Providence police station, Rivera positively identified defendant from a photo lineup as the man running from the vacant lot; she confirmed her identification in court during defendant's bail hearing.

The state's firearm expert and the medical examiner described the probable last moments of Feliciano's life. The firearm expert testified that he examined four nine-millimeter shell casings, which Detective Patricia Cornell (Det.Cornell) of the Providence Police Department testified were found between four and eight feet from where Feliciano's body was found. He determined that all four shells were fired from the same gun. The firearm expert added that the recovered shells encased hollow-point bullets, which, he explained, open like a flower upon impact to cause maximum damage. The medical examiner testified that two projectiles actually hit Feliciano—one grazing the right side of his head and the other causing a "devastating, catastrophic fatal injury." The medical examiner determined from the trajectory of these bullets that they were fired in rapid succession, making it highly probable that one person fired the shots.

In addition to the four shell casings, the police recovered a black pager approximately eight feet from where Feliciano's body was found. Detective James Marsland (Det.Marsland) testified that he seized defendant's turquoise pager upon his arrest on October 28, 1999, and took it, along with the black pager recovered at the scene of Feliciano's murder, to Rhode Island Beeper Center (Beeper Center) and discovered that both pagers bore the same account number and were registered to a Manuel Pona. In fact, it was established that someone went to Beeper Center the same day as Feliciano's murder and had the company disconnect the pager found at the crime scene and issue a new pager with the same telephone number.[2]

1. The jury was deprived the benefit of fifteen-year-old Jennifer Rivera's live testimony because, on the night before she was scheduled to take the stand, Rivera was murdered, shot twice in the head at close range following months of repeated threats that she would be killed if she testified against defendant. The defendant was convicted in 2003 of several crimes relating to Rivera's death, including murder and conspiracy. *See In re Court Order Dated October 22, 2003*, 886 A.2d 342 (R.I.2005). Because the jury questionnaires had referred to Rivera's murder, before commencement of defendant's trial for Hector Feliciano's murder, the trial justice cautioned the jury not to draw any negative inference against defendant from the fact of Rivera's homicide.

2. At trial, it was established that defendant also was known as Manuel or Manny Pona.

Only hours after Feliciano's murder, a Blazer was discovered on fire on Elmwood Avenue in Providence. Fourteen-year-old Jason Burtrado testified that he arrived at the scene of the blaze before the Providence Fire Department. Burtrado testified that he saw a person running from the burning truck. Two days later, at a photo lineup, Burtrado identified the fleeing man as defendant. At the time of his trial testimony, however, Burtrado admitted that he no longer could positively identify defendant as the man he saw run from the burning Blazer. Joseph Dorsey of the Providence Fire Department's arson division determined that three separate fires had been set: one on each of the front fenders and one inside the Blazer on the passenger seat. Furthermore, Liberal Oliveira from North Eastern Technical Services, Inc., a private company that conducted the forensic testing of the Blazer at Det. Marsland's request, testified that the Blazer showed no signs of forced entry and that the ignition had not been tampered with, despite signs of a superficial attempt to make it look as though the ignition had been compromised.

Once word of the burning Blazer reached the Feliciano murder scene, the police escorted Echevarria, Feliciano's older brother, to Elmwood Avenue, where he confirmed that the charred Blazer was, in fact, the same vehicle he had seen leaving Carrasco's driveway shortly after hearing the gunshots. According to Det. Cornell of the state crime lab, defendant's finger-prints were lifted from the Blazer's rear passenger doorjamb and from the Blazer's passenger door.

The police recorded the burned Blazer's license plate number as PS–997, just one digit removed from the number that Carrasco reported.[3] A search for this record revealed that the 1999 Chevy Blazer was registered to Enterprise Rent–A–Car (Enterprise). Joseph Furtado, the assistant branch manager of the Enterprise location where the Blazer was rented, testified that Kathleen Riley rented the vehicle the day before Feliciano's murder, August 27, 1999. According to Furtado, when Riley left the Enterprise office to claim the Blazer, she first stopped to talk with the driver of a vehicle that was parked in the Enterprise lot. Furtado claimed to have seen three or four young black males inside the vehicle. Furtado observed this second vehicle follow Riley, who was now driving the rented Blazer, out of the Enterprise lot. The investigation of defendant's pager revealed that one of the saved telephone numbers in the pager was to an office within Brown University, where Riley was employed.

Through his own testimony and that of four other witnesses, including his own mother and sister, defendant attempted to blame the murder on his father, Charles Porter, who was murdered before defendant's trial. According to defendant, in the early afternoon of August 28, 1999—

According to a Rhode Island Beeper Center employee, a person came into the store on August 28, 1999, and asked to purchase a new pager and to have that pager activated with a specific number. It was established that this specific number previously had been assigned to Manuel Pona.

3. As was mentioned previously, Carrasco testified that she remembered the license plate number as PS–977. When the Providence Police ran the plate number, however, it came back as assigned to a 1979 gray Honda. Detective Marsland testified that because eyewitnesses frequently transpose license plate numbers, it is customary for the police to run several variations of the reported number to see if they can find a vehicle matching witness descriptions. Detective Marsland testified that the number PS–997 came back as assigned to a 1999 Chevy Blazer registered to Enterprise Rent–A–Car.

the day Feliciano was murdered—defendant was visiting his sister at her apartment at 39 Comstock Avenue in Providence when his father stopped by driving a late-model Chevy Blazer. The defendant allegedly inspected his father's new vehicle, touching both the interior and exterior of the vehicle. The defendant asked his father whether he could take the Blazer for a drive, but his father refused, instead telling defendant that he might be able to take the car later that evening. The defendant testified that he gave his father his pager so defendant could reach his father to take the Blazer out that night. The defendant said that after his father left, he spent the rest of the day at his sister's apartment, save for a brief drive in his own car through an area of Providence known as "Clowntown." The defendant testified that he did not see his father again until approximately four hours after their first encounter, at around 6:30 p.m., and he was driving a blue Oldsmobile instead of the Blazer. The defendant also claimed that his father told him he had lost defendant's pager, but gave him $80 to purchase a new one.

The state presented Det. Marsland as a rebuttal witness after defendant rested his case-in-chief. Detective Marsland testified that, on October 28, 1999, he conducted defendant's interrogation. Notably, Det. Marsland testified that, during questioning, defendant insisted that he had never been in the Blazer that was seen leaving the scene of Feliciano's murder. According to Det. Marsland, when he confronted defendant with the fingerprint evidence, the pager found at the crime scene, and Rivera's identification, defendant became physically ill and asked to speak with his mother. After defendant was permitted to meet with his mother and sister privately, defendant's story changed and he admitted being in the front passenger seat of the Blazer. The defendant also told Det. Marsland that only one hour and twenty minutes elapsed between the time defendant first saw his father and again when he returned in the Oldsmobile.

The defendant was indicted on three counts: (1) murder; (2) carrying a pistol without a license; and (3) attempted arson of a motor vehicle. On July 20, 2000, a jury convicted defendant on all three counts. The defendant moved for a new trial, which was denied. He was sentenced as follows: a mandatory life term for first-degree murder; ten years for carrying a pistol without a license, to run concurrently with the life sentence; and twenty years, eight to serve, with twelve suspended, with probation, for attempted arson of a motor vehicle to run consecutively to the life sentence. The defendant timely appealed.

## II

### Analysis

On appeal, defendant raises four arguments. First, defendant argues that the trial justice committed clear error by overruling his *Batson*[4] objection to the state's use of a peremptory challenge to excuse the only black juror from the venire. Second, defendant alleges that Det. Marsland should not have been permitted to testify as to defendant's custodial statements during questioning because the state failed to prove that defendant voluntarily, knowingly, and intelligently waived his *Miranda*[5] rights. Third, defendant contends that he was entitled to a *Franks*[6] hearing because

---

4. *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).

5. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

6. *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct.

material misrepresentations were made in the affidavit supporting his arrest warrant. Finally, defendant argues that the trial justice erred in denying his motion for a new trial. We address each contention below.

## A

### *Batson* Objection

During jury selection, the state exercised a peremptory challenge to strike the only black juror from the venire, Juror 168.[7] The defendant, who describes himself as an African American, immediately objected and a hearing at sidebar ensued. The trial justice recognized the *Batson* issue and instructed the parties on their respective burdens of proof.[8]

In accordance with the trial justice's instruction, the prosecution offered three purportedly race-neutral justifications for challenging Juror 168. The state first explained that the juror had two brothers who were then on active duty with the Rhode Island State Police and the Providence Police Department, respectively. As a result, the state feared that the juror might be inclined to vote for acquittal to defeat the assumption that some might hold, by virtue of her family's law enforcement background, that she would side with the police and, thus, the prosecution. Second, the state alleged that it was con-

cerned with the relationship between the juror's brother in the Providence Police Department and defense counsel. According to defense counsel, Juror 168's brother was involved in narcotics investigations in Providence and frequently testified against his clients. Although the degree and tenor of this relationship was contested, the prosecution expressed concern that their familiarity might influence Juror 168, presumably disadvantaging the prosecution. Finally, the state averred that the juror's inattentiveness, lack of eye contact, and body language throughout voir dire indicated a "lack of investment in the matter at hand" and caused the prosecution to question her participation level at trial.

The trial justice then permitted defendant to rebut the prosecution's justifications. First, defense counsel himself explained that his relationship with Juror 168's brother, while frequent and professional, never was more than that of cross-examiner and witness, and certainly was not one of "friendliness or sociability." The defendant also argued that the state's inattentiveness justification was a ruse because the same objection "could apply to half the people sitting in the [jury] box." Finally, defendant countered that (1) the fact that Juror 168 had family members in law enforcement ordinarily would be a circumstance that would favor the prosecution, and (2) the trial justice should consid-

---

2674, 57 L.Ed.2d 667 (1978).

7. During sidebar following defendant's objection, the state suggested that there was, in fact, another black juror in the venire. This purported fact was not referred to in any brief to this Court, however, and at oral argument neither party could confirm whether this was true.

8. The trial justice issued the following instruction:

"We run into a *Batson* problem. First, there must be a prima facie case of racial discrimination. If I'm satisfied, obviously,

that test is met it is then the burden upon the proponent of the challenge to come forward with a race-neutral explanation. And, then, if the race-neutral explanation is tendered, the trial court must then decide whether the opponent of the challenge has proved purposeful racial discrimination. The second step of this process does not demand an explanation that is persuasive or even plausible. Unless discriminatory intent is inherent in the prosecutor's explanation, the reason offered would be deemed race neutral."

er this justification skeptically because its implausibility lent support to the proposition that the peremptory strike of Juror 168 was motivated solely by race.

After hearing all arguments, the trial justice upheld the state's challenge, ruling as follows:

"Based on the representations and reasons given by the state, I'm fully satisfied that there has been no purposeful racial discrimination, and the explanations given by the prosecutor are, indeed, race-neutral. The challenge shall be honored."

The defendant argues on appeal that the trial justice committed clear error by not finding the prosecution's race-neutral reasons pretextual and by concluding that the state's peremptory strike was not motivated by purposeful discrimination.

1

### Batson and its Progeny

■ In 1986, the United States Supreme Court decided *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), which held that "[t]he Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race[.]" *Id.* at 86, 106 S.Ct. 1712 (citing *Strauder v. West Virginia*, 100 U.S. 303, 305, 25 L.Ed. 664 (1900)). In so holding, the Batson Court delineated a tripartite test for determining whether a criminal defendant has been denied equal protection of the laws by the state's use of a peremptory challenge.[9] *Id.* at 96–98, 106 S.Ct. 1712. First, the defendant must "establish a prima facie case of purposeful discrimination[.]" *Id.* at 96, 106 S.Ct.

1712. "Once the defendant makes a prima facie showing, the burden shifts to the State to come forward with a neutral explanation for challenging black jurors." *Id.* at 97, 106 S.Ct. 1712. Finally, "[t]he trial court then will have the duty to determine if the defendant has established purposeful discrimination." *Id.* at 98, 106 S.Ct. 1712.

In *Batson* and in subsequent decisions, the Supreme Court has provided helpful guidance with respect to each of these three steps. Regarding the first inquiry, the Batson Court explained that "a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." *Batson*, 476 U.S. at 96, 106 S.Ct. 1712. The Court continued:

"[T]he defendant first must show that he is a member of a cognizable racial group * * * and that the prosecutor has exercised peremptory challenges to remove from the venire members of the defendant's race. Second, the defendant is entitled to rely on the fact, as to which there can be no dispute, that peremptory challenges constitute a jury selection practice that permits 'those to discriminate who are of a mind to discriminate.' * * * Finally, the defendant must show that these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race. This combination of factors in the empaneling of the petit jury, as in the selection of the

9. It is noteworthy that *Batson* partially overruled *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), which subsequently had been interpreted by various courts as placing upon a criminal defendant

"a crippling burden" of proving intentional discrimination, thereby rendering "prosecutors' peremptory challenges * * * largely immune from constitutional scrutiny." *Batson*, 476 U.S. at 92–93, 106 S.Ct. 1712.

venire, raises the necessary inference of purposeful discrimination." *Id.*

Five years later, in *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), the Court eliminated the requirement that a criminal defendant share the same race as a challenged juror, explaining that "[t]o bar petitioner's claim because his race differs from that of the excluded jurors would be to condone the arbitrary exclusion of citizens from the duty, honor, and privilege of jury service." *Id.* at 415, 111 S.Ct. 1364.

■ With respect to *Batson's* second step, the Supreme Court counseled that a prosecutor's race-neutral explanation "need not rise to the level justifying exercise of a challenge for cause." *Batson,* 476 U.S. at 97, 106 S.Ct. 1712. Nevertheless, *Batson* made clear that a prosecutor cannot satisfy this burden "merely by denying that he [or she] had a discriminatory motive or '[affirming] [his or her] good faith in making individual selections.' " *Id.* at 98, 106 S.Ct. 1712 (quoting *Alexander v. Louisiana,* 405 U.S. 625, 632, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972)). In 1991, *Hernandez v. New York,* 500 U.S. 352, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), clarified that, at this second step, "the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* at 360, 111 S.Ct. 1859.

■ Finally, concerning *Batson's* third step, the Supreme Court instructed that a trial justice must "undertake 'a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.' " *Batson,* 476 U.S. at 93, 106 S.Ct. 1712 (quoting *Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977)). In *Hernandez,* the Court further explained that "the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." *Hernandez,* 500 U.S. at 365, 111 S.Ct. 1859. In *Purkett v. Elem,* 514 U.S. 765, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam), the Court offered the following regarding the interplay between the second and third *Batson* steps:

"It is not until the *third* step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination. * * * At that stage, implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination. But to say that a trial judge *may choose to disbelieve* a silly or superstitious reason at step three is quite different from saying that a trial judge *must terminate* the inquiry at step two when the race-neutral reason is silly or superstitious. The latter violates the principle that the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." *Id.* at 768, 115 S.Ct. 1769.

It is because a trial justice's finding of purposeful discrimination at this third step "largely will turn on evaluation of credibility, a reviewing court ordinarily should give those findings great deference." *Batson,* 476 U.S. at 98 n. 21, 106 S.Ct. 1712.

2

### Recent United States Supreme Court *Batson* Developments

In 2003—three years after defendant's conviction in the instant case—the United

States Supreme Court imbued the *Batson* test with new vitality in the first of two companion decisions: *Miller–El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (*Miller–El I*), and *Miller–El v. Dretke*, 545 U.S. 231, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (*Miller–El II*). In that case, during voir dire the prosecution exercised peremptory challenges to exclude ten of eleven black venire members from serving on the petit jury that would decide the merits of *Miller–El's* capital murder charge in Texas state court. *Miller–El I*, 537 U.S. at 328, 331, 123 S.Ct. 1029. *Miller–El* moved to strike the jury, arguing that the peremptory challenges violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Id.* at 328, 123 S.Ct. 1029. Following a *Swain*[10] hearing, the state court denied *Miller–El's* motion.[11] *Id. Miller–El* subsequently was convicted of capital murder and sentenced to death. *Id.* While *Miller–El's* appeal was pending in the Texas Court of Criminal Appeals, the United States Supreme Court decided *Batson*, and the case was remanded for further findings in light of that decision. *Id.* at 328–29, 123 S.Ct. 1029. *Miller–El* again was denied relief. *Id.* at 329, 123 S.Ct. 1029. After exhausting all avenues of postconviction relief through the state of Texas, he turned to the federal courts; eventually the United States Court of Appeals for the Fifth Circuit denied Miller–El's petition for habeas corpus.[12] *Id.* at 329–30, 123 S.Ct. 1029.

The United States Supreme Court granted certiorari and reversed the Fifth Circuit, holding that Miller–El was entitled to habeas relief. The Court began by conducting a comparative juror analysis, which it described as a "side-by-side comparison[ ] of some black venire panelists who were struck and white panelists allowed to serve." *Miller–El II*, 545 U.S. at 241, 125 S.Ct. 2317. The Court explained that "[i]f a prosecutor's proffered reason for striking a black panelist applies just as well to an otherwise-similar nonblack who is permitted to serve, that is evidence tending to prove purposeful discrimination to be considered at *Batson's* third step." *Id.* Noting that although peremptory challenges "are often the subjects of instinct,"

"when illegitimate grounds like race are in issue, a prosecutor simply has got to state his reasons as best he can and stand or fall on the plausibility of the reasons he gives. A *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not

---

**10.** *Swain v. Alabama*, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965).

**11.** At the time of defendant's trial, the United States Supreme Court had not yet decided *Batson;* thus the controlling precedent was *Swain. Swain* required that, to prevail on an equal protection challenge to the prosecutor's use of a peremptory strike, a criminal defendant must demonstrate that "the prosecution's conduct was part of a larger pattern of discrimination aimed at excluding African–Americans from jury service." *Miller–El v. Cockrell*, 537 U.S. 322, 328, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) (*Miller–El I*).

**12.** The first time *Miller–El's* case reached the United States Supreme Court in *Miller–El I* the Court had granted certiorari to review the denial of *Miller–El's* application for a certificate of appealability (COA) by the United States Court of Appeals for the Fifth Circuit. *Miller–El I*, 537 U.S. at 341, 123 S.Ct. 1029. The *Miller–El I* Court remanded the case with instructions to grant the COA, and the case returned to the Supreme Court after the Fifth Circuit denied Miller–El habeas corpus relief. *Miller–El v. Dretke*, 545 U.S. 231, 237, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) (*Miller–El II*).

have been shown up as false." *Id.* at 252, 125 S.Ct. 2317.

In addition to the sheer statistics of challenged black venire members versus nonblacks allowed to serve and the telling results of a comparative analysis of the same, *id.* at 240–51, 125 S.Ct. 2317 the Supreme Court cited its concern with several other questionable practices the prosecution employed throughout the selection of *Miller–El's* petit jury. First, the Supreme Court noted the discriminatory use of a Texas procedure known as the jury shuffle, whereby "either side may literally reshuffle the cards bearing panel members' names, thus rearranging the order in which members of a venire panel are seated and reached for questioning." *Id.* at 253, 125 S.Ct. 2317. The Court concluded that

> "the prosecution's decision to seek a jury shuffle when a predominant number of African–Americans were seated in the front of the panel, along with its decision to delay a formal objection to the defense's shuffle until after the new racial composition was revealed, raise a suspicion that the State sought to exclude African–Americans from the jury." *Id.*

at 254, 125 S.Ct. 2317 (quoting *Miller–El I*, 537 U.S. at 346, 123 S.Ct. 1029).

In addition, the Court referenced the prosecution's disproportionate use of loaded questions at voir dire concerning black venire members' views on the death penalty and the mandatory minimum sentence for murder as designed to elicit objectionable responses from minority venire members, thereby generating viable race-neutral reasons for excluding black venire members from the petit jury.[13] Finally, the Supreme Court considered the long-standing policy of systematically excluding blacks from juries, highlighted by a practice manual for all new Dallas County district attorneys that instructed newly anointed prosecutors on the reasons for excluding minorities from jury service. In light of the overwhelming evidence of purposeful discrimination, the Court concluded that "[t]he [peremptory] strikes correlate with no fact as well as they correlate with race, and they occurred during a selection infected by shuffling and disparate questioning that race explains better than any race-neutral reason advanced by the State." *Id.* at 266, 125 S.Ct. 2317. These alarming facts stand in stark contrast to the circumstances in the case now before this Court.

---

13. The record demonstrated that the prosecution disproportionately prefaced its inquiry at voir dire of black venire members' views on the death penalty with a graphic explanation of the capital punishment process in the State of Texas. *Miller–El II*, 545 U.S. at 255–60, 125 S.Ct. 2317. The Supreme Court was persuaded by *Miller–El's* argument that this technique probably was "intended * *[ ]* to prompt some expression of hesitation to consider the death penalty and thus to elicit plausibly neutral grounds for a peremptory strike of a potential juror subjected to it, if not a strike for cause." *Id.* at 255, 125 S.Ct. 2317. Furthermore, the Court faulted the prosecution's "trick" questioning of black venire members concerning the mandatory minimum sentence for murder. The Court explained this practice as follows:

> "The prosecutors asked members of the panel how low a sentence they would consider imposing for murder. Most potential jurors were first told that Texas law provided for a minimum term of five years, but some members of the panel were not, and if a panel member then insisted on a minimum above five years, the prosecutor would suppress his normal preference for tough jurors and claim cause to strike." *Id.* at 261, 125 S.Ct. 2317.

As with the death penalty questioning, the Court concluded that this technique was designed to manufacture race-neutral reasons to justify a peremptory strike. *Id.* at 263, 125 S.Ct. 2317.

*Batson's* third prong is not the only step that recently has received attention. In *Johnson v. California*, 545 U.S. 162, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005), decided the same day as *Miller–El II*, the Supreme Court clarified an objector's burden in *Batson's* first step. In that case, before Johnson's trial for second-degree murder and assault, the prosecution used three of its twelve peremptory challenges to strike the only three black venire members eligible for service on the petit jury. *Id.* at 164, 125 S.Ct. 2410. Overruling Johnson's two objections to the peremptory strikes, the trial justice concluded that Johnson had failed to demonstrate a *"strong likelihood"* of purposeful discrimination and, therefore, did not make out a prima facie case. *Id.* at 165, 125 S.Ct. 2410. Johnson subsequently was convicted on both charges and, after the Court of Criminal Appeals set aside his conviction, *see People v. Johnson*, 105 Cal.Rptr.2d 727 (Cal.Ct. App.2001), the California Supreme Court reinstated the judgment of conviction, holding that *Batson* "permits a court to require the objector to present, not merely 'some evidence' permitting the inference, but 'strong evidence' that makes discriminatory intent *more likely than not* if the challenges are not explained." *Johnson*, 545 U.S. at 167, 125 S.Ct. 2410 (quoting *People v. Johnson*, 30 Cal.4th 1302, 1 Cal. Rptr.3d 1, 71 P.3d 270, 278 (2003)).

The United States Supreme Court granted certiorari and reversed the California Supreme Court, holding that "California's 'more likely than not' standard is an inappropriate yardstick by which to measure the sufficiency of a prima facie case." *Johnson*, 545 U.S. at 168, 125 S.Ct. 2410. The Court stated that it "did not intend the first [*Batson*] step to be so onerous[.]" *Id.* at 170, 125 S.Ct. 2410. "Instead, a defendant satisfies the requirements of *Batson's* first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." *Id.* The Court clarified the interplay among the three *Batson* steps:

> "The first two *Batson* steps govern the production of evidence that allows the trial court to determine the persuasiveness of the defendant's constitutional claim. 'It is not until the *third* step that the persuasiveness of the justification becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination.'" *Id.* at 171, 125 S.Ct. 2410 (quoting *Purkett*, 514 U.S. at 768, 115 S.Ct. 1769).

The Court concluded that the evidence Johnson presented was sufficient to establish a prima facie case under *Batson*. *Id.* at 173, 125 S.Ct. 2410.

### 3

### Applicable Law

■ Having set forth the current state of the Supreme Court's *Batson* jurisprudence, we now ascertain the law applicable to the present appeal. We note that defendant's appellate arguments on this issue rely heavily upon the more exacting standards announced in the aforementioned *Miller–El* decisions. However, these cases were decided years *after* the trial justice's *Batson* ruling in this case in June 2000. Therefore, our resolution of the instant matter essentially depends upon whether defendant can benefit from a retroactive application of these *Miller–El* decisions.

■ Typically, when a new rule of criminal procedure is announced during the pendency of a defendant's direct appeal, the defendant will benefit from a retroactive application of that rule. *State v. Feliciano*, 901 A.2d 631, 639 n. 6 (R.I.2006) (citing *Pailin v. Vose*, 603 A.2d 738, 742

(R.I.1992)); *see also Dart Industries, Inc. v. Clark,* 657 A.2d 1062, 1065 (R.I.1995) (recognizing that, according to *Griffith v. Kentucky,* 479 U.S. 314, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), "all newly declared [criminal] rules must be applied to all criminal cases pending on direct review").[14] The United States Supreme Court has offered some guidance on what constitutes a "new rule" for retroactivity purposes: "In general,* * * a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government." *Teague v. Lane,* 489 U.S. 288, 301, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989). Put differently, "a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Id.*

Although the *Miller–El* decisions undoubtedly were important contributions to *Batson* jurisprudence, they were by no means novel. *Cf. Jordan v. Dretke,* 2006 U.S. Dist. LEXIS 7865, *18 (N.D.Tex. 2006) (holding that *Miller–El II* "does not recognize a new constitutional right" to be applied retroactively). In fact, both *Miller–El I* and *Miller–El II* simply applied the existing *Batson* test, albeit with an arguably newfound rigor, which was entirely warranted given the particularly egregious set of facts underlying that death penalty prosecution. In any event, neither decision imposed upon the state and federal courts any new obligation under the existing *Batson* rubric. Therefore, we must conclude that there simply is no new rule to apply retroactively to defendant's case. Instead, we apply the principles of *Batson* as they existed at the time

the trial justice in the instant case rendered his ruling.

By July 2000, this Court had, pursuant to *Batson* and its progeny, found numerous race-neutral reasons to be permissible justifications for exercising a peremptory challenge to strike a minority venire member. *See State v. Price,* 706 A.2d 929, 934–35 (R.I.1998) (venire member's extensive criminal history); *State v. Mollicone,* 654 A.2d 311, 324 (R.I.1995) (venire member's lack of intelligence necessary to comprehend complex trial concepts as indicated by her questionnaire answers); *State v. Austin,* 642 A.2d 673, 678–79 (R.I.1994) (venire member who volunteered that his son currently was incarcerated for the same crime for which the defendant was on trial); *State v. Ramos,* 574 A.2d 1213, 1217 (R.I.1990) (venire member's mere acquaintance with defense counsel); *State v. Barber,* 539 A.2d 76, 78 (R.I.1988) (venire member's advanced age). Most important to the disposition of the present case, however, we previously had held that a potential juror's demeanor by itself constituted a permissible race-neutral reason upon which to base a peremptory strike of a minority venire member. In *State v. Holley,* 604 A.2d 772 (R.I.1992), on the defendant's objection to the state's peremptory challenge of the only black venire member, the prosecutor explained that he had "a right to peremptory [*sic*] challenge somebody on body motion, eye contact[,]" and because he was concerned with the potential juror's "demeanor and his ability to follow * * * [the trial justice's] instructions regarding the standard of proof." *Id.* at 778. This Court upheld the trial justice's decision to allow the challenge.

---

**14.** Of course, the retroactivity analysis differs significantly if a new rule of criminal procedure is announced while a defendant's collateral attack on his conviction is pending. *See, e.g., Taylor v. Wall,* 821 A.2d 685, 689–91 (R.I.2003) (quoting *Pailin v. Vose,* 603 A.2d

738, 742 (R.I.1992)) (discussing and applying the two exceptions to the general rule that a court will consider a petition for collateral attack "under the 'constitutionally mandated criminal procedure at the time the defendant's conviction became final' ").

*Id.* We reached a similar conclusion in *State v. Lopez,* 721 A.2d 837 (R.I.1998), affirming a trial justice's decision to allow the state's peremptory challenge of a Hispanic-surnamed venire member based on the prosecutor's "gut feeling" and the potential juror's demeanor at voir dire. *Id.* at 838–39.

Also of particular importance to the instant case is the fact that this Court previously had upheld a trial justice's overruling of a *Batson* objection despite a terse discussion of his rationale for that determination. *Lopez,* 721 A.2d at 839. We upheld his unexplained decision to credit the state's race-neutral reason as follows:

> "After hearing the prosecutor's rationale, the trial justice overruled the defendant's objection, *apparently* viewing the prosecutor's reason as race-neutral. Therefore, since the trial justice accepted both the prosecutor's explanation as satisfying the race-neutral reason for the peremptory challenge and *implicitly* concluded that the prosecutor did not discriminate on the basis of race or ethnicity, we cannot say that the trial justice was clearly wrong in overruling defendant's *Batson* objection." *Id.* at 839 (emphases added).

Thus, a trial justice was under no obligation, at the time of the ruling in this case, to place on the record his findings with respect to the credibility of a prosecutor's race-neutral explanations.

■ Having set forth the law applicable to this appeal, we may now proceed with our analysis. In the instant matter, there is no question that the first and second *Batson* steps were satisfied. Although the trial justice did not state explicitly whether defendant made a *prima facie* showing of purposeful discrimination, he did require the state to offer a race-neutral reason for the peremptory strike, and he ruled on the ultimate question of intentional discrimina-

tion; thus, "the preliminary issue of whether [ ] defendant had made a *prima facie* showing [became] moot." Austin, 642 A.2d at 678 (quoting *Hernandez,* 500 U.S. at 359, 111 S.Ct. 1859). Furthermore, there is no argument that the state did not satisfy its minimal burden in the second *Batson* step by offering three purportedly race-neutral reasons to justify the peremptory challenge. *See Purkett,* 514 U.S. at 768, 115 S.Ct. 1769. Instead, on appeal defendant takes issue only with the trial justice's performance in the third *Batson* step. We discern three arguments defendant advances in this regard.

### i

### The Trial Justice's Inquiry

We first address defendant's argument that the trial justice erred at *Batson's* third step by failing to make a comprehensive ruling on the record assessing the credibility of the state's race-neutral reasons and addressing defendant's arguments that the state's purportedly race-neutral reasons were pretextual. To support his argument, defendant cites a series of federal decisions that he claims required the trial justice to do exactly this. *See, e.g., Barnes v. Anderson,* 202 F.3d 150, 156 (2d Cir.1999); *United States v. Harris,* 192 F.3d 580, 588 (6th Cir.1999). However, these decisions—from the Second and Sixth Circuits, respectively—were not controlling law in this jurisdiction at the time the trial justice made his decision in this case, nor are they now. Instead, this Court's 1998 decision in *Lopez* is dispositive of defendant's immediate contention. As we explained previously, in *Lopez,* we upheld a trial justice's ruling despite the fact that he made no effort to place on the record his findings with respect to the credibility of the prosecution's race-neutral explanations or to address the defendant's arguments concerning pretext. *Lopez,* 721

A.2d at 839. Therefore, we cannot fault the trial justice in the present case for relying on controlling precedent in overruling defendant's *Batson* objection.

 Nevertheless, we cannot ignore the practical legitimacy of defendant's argument. In light of the Supreme Court's more recent *Batson* jurisprudence, it is difficult to rationalize *Lopez's* minimal requirements with the more rigorous scrutiny a trial justice should give proffered race-neutral reasons and the considered attention he or she should afford a defendant's arguments to support a finding of purposeful discrimination. Instead, we are convinced that it is preferable to require a trial justice to place on the record his or her ruling with regard to a *Batson* objection. If this Court is to ensure that a trial justice has properly considered the credibility of each proffered race-neutral reason and has addressed each of a defendant's arguments that a peremptory strike actually was a pretext for purposeful discrimination, we must be presented with an adequate record to review on appeal. If a trial justice fails to make the requisite finding of credibility "for each challenged strike, 'the appropriate course [usually will be] to remand for findings by the [court] as to [the challenged strikes] and an ultimate determination on the issue of discriminatory intent based on all the facts and circumstances.'" *Barnes*, 202 F.3d at 156 (quoting *United States v. Alvarado*, 923 F.2d 253, 256 (2d Cir.1991)); *accord*

*Harris*, 192 F.3d at 588. However, we are not inclined to apply this rule to the instant case. Instead, the rule announced herein shall apply prospectively only to *Batson* rulings made after the publication date of this opinion. To the extent that *Lopez* is inconsistent with this rule, it is hereby overruled.

### ii

### Pretext

 The defendant also attempts to undermine the legitimacy of each of the prosecution's race-neutral explanations, essentially asserting that because each of the reasons is implausible or not supported by the record, collectively they raise the specter of racial discrimination. First, defendant contests the legitimacy of the state's first race-neutral explanation, contending that jurors with relatives in law enforcement ordinarily make ideal fact-finders for the prosecution. In addition, defendant argues that Juror 168's brother's allegedly "close" relationship with defense counsel was pretextual because their relationship was not "close," but adversarial. Finally, defendant contests the legitimacy of the state's final reason, that Juror 168's inattentiveness, lack of eye contact, and objectionable body language throughout voir dire constituted a sufficiently race-neutral reason to justify the peremptory strike of Juror 168.[15]

---

15. In rebutting this argument at voir dire, defendant claimed that the state's reason "could apply to half the people sitting in the box over there." The defendant now characterizes this comment as an argument that the state's reason "tends to show purposeful discrimination because the reason applied equally to nonblacks who were permitted to serve." However, it seems to us too great a stretch to characterize defendant's off-the-cuff comment at voir dire as a sufficiently focused objection to the effect that a comparative analysis of Juror 168 to other similarly situated nonblack

venire members would reveal that the others suffered from a similar lack of focus. *See, e.g., State v. Feliciano*, 901 A.2d 631, 646 (R.I.2006) (holding that objections not " 'sufficiently focused so as to call the trial justice's attention to the basis for said objection, may not be considered on appeal' "). In any event, defendant offered no evidence to support this argument and, contrary to his appellate contention, this lack of evidence simply does not comport with "the principle that the ultimate burden of persuasion regarding ra-

Even assuming, *arguendo*, that defendant's concerns about the prosecution's first two race-neutral reasons are meritorious, Juror 168's demeanor at voir dire was a sufficient race-neutral basis upon which to base a peremptory challenge according to the controlling law in this jurisdiction at the time the trial justice made his ruling in this case. *See Holley*, 604 A.2d at 777–78 (holding that a venire member's demeanor was a sufficient race-neutral reason to sustain a peremptory strike). Furthermore, to the extent that defendant suggests *Miller–El II* bolsters these several pretext arguments—a case that we already have decided is not applicable to this appeal— we note that this case is not *Miller–El II*; the evidence of arguable pretext that defendant has presented in the present case pales in comparison to the overwhelming indicia of purposeful discrimination uncovered in *Miller–El II*. Thus, we are satisfied that Juror 168's undisputed demeanor at voir dire, standing alone, constituted a sufficient race-neutral reason that satisfied *Batson* in this case. The trial justice committed no error in this regard.

iii

**Comparative Juror Analysis**

█ Finally, we address defendant's argument that the first of the state's purportedly race-neutral reasons for exercising a peremptory challenge of Juror 168— because she had two brothers actively serving in Rhode Island police departments—was a pretext for racial discrimination because similarly situated nonblack venire members with family members in law enforcement were not excused from the venire. In so arguing, defendant invites this Court to conduct, for the first time on appeal, a comparative juror analysis akin to that performed by the United States Supreme Court in *Miller–El II*.

The state counters, however, that defendant waived this "equally-applicable-to-nonblacks" argument because he failed to raise it before the trial justice. For support, the state cites *United States v. Houston*, 456 F.3d 1328 (11th Cir.2006), in which the United States Court of Appeals for the Eleventh Circuit recently held that, to preserve this precise argument for appeal, a defendant must raise it in *Batson's* third step. *Id.* at 1338–39. The Eleventh Circuit reasoned that absent this argument in the trial court, an appellate court is left without "the benefit of the prosecutor's explanation for why he struck the black venire members rather than the white venire members now alleged to be similarly situated." *Id.* at 1338. Furthermore, the appellate court is left without "the benefit of a finding by the trial judge as to the credibility of such explanations." *Id.; see also State v. Young*, 76 Conn.App. 392, 819 A.2d 884, 889–90 (2003) (holding that a moving party's failure to alert the trial court of the identical argument renders the contention unreviewable because the record is insufficient).

We must agree with the state. Because of defendant's failure to have made this argument to the trial justice, we have no findings on the record regarding the merits of this contention and the credibility of the prosecutor refuting the argument. Therefore, in accordance with our well-settled raise-or-waive rule, *State v. Brown*, 915 A.2d 1279, 1282 (R.I.2007) ("[t]his

cial motivation rests with, and never shifts from, the opponent of the strike." *Purkett v. Elem*, 514 U.S. 765, 768, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995). Furthermore, a careful review of defendant's argument before the trial court indicates that the thrust of his

objection on this point really was his belief that a juror's demeanor is not an adequate race-neutral reason upon which the state can base a peremptory challenge, which we address above.

Court's 'raise or waive' rule precludes consideration on appeal of issues that have not been preserved by means of a specific objection at trial"), defendant has not preserved this claim of error for our review.

We stress, however, that our ruling must not be construed as undermining the practical utility of the comparative juror analysis at uncovering pretext and ferreting out latent racial discrimination in the jury selection process. We strongly believe that the *Miller–El* decisions effectively add much needed bite to *Batson's* bark and improve a framework "designed to produce actual answers to suspicions and inferences that discrimination may have infected the jury selection process." *Johnson,* 545 U.S. at 172, 125 S.Ct. 2410. As Justice Souter aptly observed in *Miller–El II,* "the very integrity of the courts is jeopardized when a prosecutor's discrimination 'invites cynicism respecting the jury's neutrality' * * * and undermines public confidence in adjudication." *Miller–El II,* 545 U.S. at 238, 125 S.Ct. 2317 (quoting *Powers,* 499 U.S. at 412, 111 S.Ct. 1364). The heightened scrutiny encouraged by these recent decisions can only help eradicate a discriminatory practice "at war with our basic concepts of a democratic society and a representative government." *Smith v. Texas,* 311 U.S. 128, 130, 61 S.Ct. 164, 85 L.Ed. 84 (1940). Unfortunately for defendant, however, these overarching precepts cannot save a party from the dictates of our raise-or-waive rule.

These recent United States Supreme Court decisions discussed *supra* endeavor to sharpen a trial justice's inquiry into the credibility of a prosecutor's race-neutral reasons. After *Miller–El II,* the question at *Batson's* third step no longer simply is whether a trial justice *believes* a prosecutor's facially race-neutral reason for exercising a peremptory strike. Instead, a trial justice should consider all the evidence presented both in support of and in contravention to a purported race-neutral reason and should search beyond the face of a proffered justification to ensure that, as applied to the facts of the particular case and with due regard to a comparison of stricken minority venire members to those nonminority members allowed to serve, a peremptory challenge was not, in fact, racially motivated. In this case, the prosecution's justification that Juror 168's inattentiveness, lack of eye contact, and body language throughout voir dire indicated a "lack of investment in the matter at hand" satisfies our *Batson* jurisprudence as it stood in June 2000 when the trial justice made his ruling in this case. In light of the recent water under the *Batson* bridge, however, henceforth prosecutors must thoroughly explicate their race-neutral reasons, and trial justices and this Court must be more vigilant to ensure that racial animus does not infect jury selection by applying the more potent standards set forth in *Miller–El I, Miller–El II,* and *Johnson.*

## B

### *Miranda* Waiver

■ It will be recalled that approximately two months after Feliciano's murder, on October 28, 1999, defendant was arrested and taken to the Providence police station for questioning. During this interrogation, defendant made several statements to Det. Marsland in an attempt to exculpate himself with respect to Feliciano's murder. Before his trial began, defendant filed a motion *in limine* to suppress any statements he made during his questioning, alleging that he did not voluntarily, knowingly, and intelligently waive his *Miranda* rights. Accordingly, a hearing on defendant's motion was held on June 28, 2000. Detective Marsland was the only witness to testify at the hearing

and, after hearing his testimony, the trial justice denied defendant's motion to suppress, ruling that the state had proven by clear and convincing evidence that defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights.

On appeal, defendant contests the trial justice's ruling, asserting that the state should be required to make at least a minimal effort to memorialize defendant's custodial statement or to secure defendant's signature on a pre-printed rights form to satisfy its burden of proving a voluntary, knowing, and intelligent waiver of *Miranda* rights. Not to do so, defendant claims, violated his rights under article 1, section 10, of the Rhode Island Constitution and the Fifth Amendment to the United States Constitution.

▇ We need not reach the merits of defendant's claim. Critically, Det. Marsland was recalled to testify as a *rebuttal* witness regarding the substance of the interrogation to contradict testimony given by defendant during his case-in-chief. Detective Marsland's testimony demonstrated that defendant had subscribed to no less than three stories to explain his fingerprints on the Blazer and that defendant had told Det. Marsland previously that only one hour and twenty minutes had elapsed between the two encounters with his father on the day of Feliciano's murder, whereas defendant testified at trial that this window of time was closer to four hours. It is well settled in this jurisdiction that, in accordance with *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28

L.Ed.2d 1 (1971), "statements, inadmissible against a defendant in the prosecution's case in chief because of a lack of the procedural safeguards required by [*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966)], may, if their trustworthiness satisfies legal standards, be used for impeachment purposes to attack the credibility of a defendant's direct testimony at trial." *State v. Mattatall*, 603 A.2d 1098, 1111 (R.I.1992). Therefore, in the present case, even if defendant's custodial statements were inadmissible in the prosecution's case-in-chief as violative of the prophylactic requirements of *Miranda*—an issue we need not decide—Det. Marsland's testimony regarding those statements was admissible on rebuttal to impeach defendant's trial testimony.

The trial justice committed no error.

## C

### *Franks* Hearing

The defendant next argues that the trial justice erred by failing to grant him a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).[16] The defendant contends that because the affidavit underlying his arrest warrant contained several false or misleading material facts that were included either deliberately or with a reckless disregard for the truth, the arrest warrant was invalid and, therefore, evidence obtained as a result of his arrest should have been suppressed.[17] The state counters that the

---

16. In *Franks v. Delaware*, 438 U.S. 154, 171–72, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the United States Supreme Court held that, in limited circumstances, a defendant alleging that statements in a supporting affidavit were deliberately false or made with a reckless disregard for the truth is entitled to an evidentiary hearing to prove his arguments.

17. We note that defendant does not contest on appeal the trial justice's ancillary ruling that a turquoise pager, collected from defendant upon his arrest, was admissible into evidence. Indeed, after the trial justice denied defendant's motion requesting a *Franks* hearing, defendant conceded that his motion to suppress the turquoise pager was moot:

underlying affidavit was free from material inaccuracies and that defendant's arguments essentially are moot because the Providence police had independent probable cause to effectuate a warrantless arrest.[18]

Pursuant to the United States Supreme Court's decision in *Franks*, a defendant is entitled to a hearing to challenge the integrity of a warrant "obtained through the deliberate or reckless inclusion of false or misleading material statements in a warrant application and affidavit * * *." *State v. Verrecchia*, 880 A.2d 89, 99 (R.I.2005) (quoting *State v. DeMagistris*, 714 A.2d 567, 574 (R.I.1998)). "[A] showing of deliberate or reckless material *omissions* " also will satisfy this requirement for a *Franks* hearing. *Id.* at 99 n. 22 (emphasis added). This entitlement, however, is conditioned upon certain threshold criteria. To begin with, "[t]here is * * * a presumption of validity with respect to the affidavit supporting the search warrant." *Id.* at 99 (quoting *Franks*, 438 U.S. at 171–72, 98 S.Ct. 2674). To be entitled to an evidentiary hearing, " '[t]here must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. * * * Allegations of negligence or innocent mistake are insufficient.' " *Id.* If, despite the satisfaction of these criteria, a hearing justice finds that, putting the challenged portions of the warrant affidavit aside, sufficient probable cause still exists to support the issuance of the warrant, the challenger is not entitled to an evidentiary hearing. *Id.* " 'On the other hand, if the remaining content is insufficient, the defendant is entitled, under the Fourth and Fourteenth Amendments, to his hearing.' " *Id.*

This Court affords deference to a trial justice's denial of a *Franks* hearing, and will overturn such a decision only if it was clearly erroneous. *Verrecchia*, 880 A.2d at 99 (citing *United States v. Santana*, 342 F.3d 60, 66 (1st Cir.2003)). Furthermore, "the party seeking a *Franks* hearing bears the burden of proof." *Id.* (citing *United States v. Chavez–Miranda*, 306 F.3d 973, 979 (9th Cir.2002)).

In the instant case, the affidavit submitted in support of defendant's arrest warrant recited the following facts. On August 28, 1999, Feliciano sustained gunshot wounds and later died at Rhode Island Hospital. Witnesses reported seeing a dark-skinned male flee the crime scene in

"Your Honor, the motion for a *Franks* hearing was filed subsequent to the motion to suppress tangible evidence. We concur with the court that unlawful search incident to a lawful arrest would allow for the beeper that was seized on the person of the defendant to be introduced into evidence." Therefore, only the trial justice's denial of defendant's motion requesting a *Franks* hearing is before this Court.

18. The state also suggests that defendant may not have been entitled to a *Franks* hearing at all because the warrant at issue in this case was for an *arrest*, not a *search* such as that at issue in *Franks*. This jurisdiction has yet to decide whether the principles announced in *Franks* apply with equal force to an affidavit underlying an arrest warrant. We do note, however, that a fair number of courts confronted with this issue have extended *Franks* also to include challenges to arrest warrants. *See, e.g., United States v. Colkley*, 899 F.2d 297, 299–302 (4th Cir.1990); *United States v. Martin*, 615 F.2d 318, 327–29 (5th Cir.1980); *State v. Bergin*, 214 Conn. 657, 574 A.2d 164, 169 n. 8 (Conn.1990); *State v. Manuel*, 213 Wis.2d 308, 570 N.W.2d 601, 603–05 (Ct.App. 1997). *But see United States v. Awadallah*, 349 F.3d 42, 64 n. 17 (2d Cir.2003) (noting that neither the Second Circuit nor the United States Supreme Court ever has expressly held that *Franks* is extended to include subfacial attacks to the validity of arrest warrants). For the purposes of this appeal, we shall assume without deciding that *Franks* is applicable to the facts of this case.

a new-model, dark-colored Blazer or Jeep. One witness was able to see the vehicle's license plate number and reported it as "PS–997." A check on the vehicle's plate number matched a 1999 blue Chevrolet Blazer registered to a car rental service. Hours later, police learned that a car was set on fire and, upon their investigation, discovered that the vehicle was a Blazer bearing the registration "PS–997." A detective processed the Blazer and was able to lift latent fingerprints from inside the compartment. The prints later were compared with inked impressions on file at the station and were positively matched to defendant. The affidavit further recounted that, immediately after the shooting, police recovered a pager six feet from the victim's body that later was traced to defendant. The affidavit also explained that a Beeper Center employee recalled that a person who identified himself as Manuel Pona came into the store shortly after the murder, asked for a new pager, and requested that it be activated with the same pager number as he had before.

In support of his motion for a *Franks* hearing below, defendant challenged seven statements made in the affidavit. He raises four of these on appeal. We address each in turn.

■ The defendant first argues that the affidavit falsely stated that a witness identified the suspect vehicle's registration as "PS–997." According to defendant, the witness actually reported the license plate number "PS–977." Indeed, Det. Marsland testified at trial that the witness informed police that the vehicle had the plate "PS–977," but when he checked the registration for that number he learned those plates were assigned to a gray Honda. After running different variations of that number, Det. Marsland discovered that a 1999 Chevrolet Blazer registered to Enterprise Rent–A–Car had the license plate number "PS–997."

The trial justice concluded that the omission did not require a *Franks* hearing. Although the affidavit did omit Det. Marsland's intervening investigatory steps, the trial justice found "nothing whatsoever * * * that in any way suggests that there was an intention by the affiant/officer to deceive the judge who issued the warrant." The trial justice further could not identify anything that "reflects reckless disregard for the truth * * *."

We agree that the omission was not deliberate or done with a reckless disregard for the truth. Although the warrant does not specifically detail each step Det. Marsland took to resolve the witness's close, but partially inaccurate, recollection, there simply was no evidence presented that Det. Marsland's synopsis was intended to deceive the issuing judge.

■ The defendant next argues that the warrant affidavit falsely indicated that latent fingerprints matching his own were lifted from the Blazer's interior compartment. Instead, defendant contends, at the time the arrest warrant was issued the only two fingerprints matching defendant's were located on the Blazer's exterior and the passenger doorjamb, not its interior compartment.

The trial justice, considering this alleged error, ruled that "whether the * * * fingerprints were found on the door handle or inside the doorjamb really is not a material issue." He further explained that the precise location of the prints was of no relevance: "[A]t the time the officer prepared the affidavit, two fingerprints were located that belonged to the defendant. Whether they were in the doorjamb, on the door handle, they were on that car in two separate places. I have no problem with this portion of the affidavit."

The trial justice committed no error in concluding that the precise location of defendant's fingerprints on the vehicle was immaterial to a finding of probable cause. Instead, probable cause was premised upon defendant's fingerprints being found *anywhere* on a vehicle that had been reported stolen, matched the description of a vehicle reported leaving the scene of a murder, and was subsequently discovered after having been set on fire.

 The defendant further challenges the portion of the warrant affidavit concerning Manuel Pona and the Beeper Center transaction. According to defendant, there was no evidence that the individual who requested a new pager identified himself as Manuel Pona.

The trial justice considered defendant's argument, but concluded that, even if this portion of the affidavit were to be redacted, there was still ample evidence in the affidavit to support a finding of probable cause. We agree. Even without the information regarding the Beeper Center transaction, the affidavit contains a positive identification of defendant from a photo lineup as the man seen running from the scene of Feliciano's murder, as well as defendant's fingerprints on the Blazer seen speeding from the scene. *See Verrecchia,* 880 A.2d at 99 (quoting *Franks,* 438 U.S. at 171–72, 98 S.Ct. 2674) ("[I]f, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required."). The hearing justice committed no error.

 Finally, defendant quarrels with the statement in the warrant affidavit that witnesses reported seeing a dark-skinned male flee the scene in a new-model, dark-colored Blazer or Jeep. According to defendant, this assertion was false because, although two witnesses said they saw a

dark-colored Blazer, only one of them recalled seeing the vehicle's occupants. Another witness, who identified the individual as a dark-skinned male, said that the individual ran to a grey Jeep, not a dark-colored Blazer.

Concerning this alleged error, the trial justice ruled:

"I'm satisfied that there's no misrepresentation whatsoever. Indeed, I'm not even satisfied that there is any negligence involved in reading that statement. More than one witness did, in fact, identify the nature of the vehicle. More than one witness, did, indeed, identify the color of the skin, namely, a dark-skinned person. And more than one of them described that person as male. And more than one of those people also indicated by way of description what can be fairly characterized as fleeing the scene; and, that more than one of these witnesses also described it as a newer type of Blazer, or Jeep. I have no problem with that first sentence whatsoever. I find it not at all to come anywhere near the standards designated by *DeMagistris* and our Supreme Court."

We agree with the trial justice's ruling. Although Det. Marsland grouped the witnesses' statements in one sentence, nothing in this portion of the affidavit was false, nor was it misleading. The affidavit alerted the trial justice that not one, but multiple, witnesses made these observations.

Therefore, we hold that the trial justice's refusal to conduct a *Franks* hearing was not clearly wrong.

### D

### Motion for New Trial

 Finally, defendant argues that the trial justice erred in denying his motion

for a new trial. Specifically, defendant claims that the trial justice's ruling was insufficient because it failed to reconcile subtle discrepancies in the trial evidence or to justify the absence of certain evidence, such as defendant's motive for killing Feliciano.

 In deciding a motion for a new trial, "the trial justice acts as a thirteenth juror and exercises independent judgment on the credibility of witnesses and on the weight of the evidence." *State v. Stansell,* 909 A.2d 505, 511 (R.I.2006) (quoting *State v. Davis,* 877 A.2d 642, 646 (R.I.2005)). "It is incumbent upon the trial justice to 'pass upon the weight and credibility of the evidence and accept or reject conflicting testimony and, in the exercise of his or her independent judgment, consider all of the material evidence in light of his or her charge to the jury * * *.'" *Id.* (quoting *State v. Hornoff,* 760 A.2d 927, 933 (R.I. 2000)). If, after performing this inquiry, the trial justice agrees with the jury's verdict, no further inquiry is required. *Id.* (citing *State v. Banach,* 648 A.2d 1363, 1367 (R.I.1994)). If the trial justice disagrees with the verdict, however, "he or she must then determine whether the evidence is such that reasonable minds could differ." *Id.* If they can, the motion should be denied. *State v. Hesford,* 900 A.2d 1194, 1199 (R.I.2006). If, however, the trial justice concludes that the state has failed to prove the defendant's guilt beyond a reasonable doubt, he or she must order a new trial. *Id.*

 "A trial justice's ruling on a motion for a new trial is accorded great weight if he or she has set forth sufficient reasoning in support of the ruling." *State v. Imbruglia,* 913 A.2d 1022, 1028 (R.I. 2007) (citing *State v. Rieger,* 763 A.2d 997, 1001–02 (R.I.2001)). As long as the trial justice has made the requisite findings on the record, his or her ruling "will not be overturned unless the trial justice was clearly wrong or unless he or she overlooked or misconceived material and relevant evidence that related to a critical issue in the case." *State v. Urena,* 899 A.2d 1281, 1290 (R.I.2006) (quoting *State v. Bolduc,* 822 A.2d 184, 187 (R.I.2003)).

In the present case, the trial justice's ruling spanned five transcript pages, excluding two pages from an earlier ruling that he incorporated by reference, in which he detailed certain witnesses' testimony. The trial justice explained that he found the testimony of all defense witnesses incredible, inconsistent, and self-serving, especially defendant's own testimony. In comparison, however, the trial justice found the state's evidence compelling. He summarized his ruling as follows:

"Suffice it to say, that from the evidence relating to the defendant's pager found at this murder scene and all of the ancillary and circumstantial evidence relating to that pager, including the numbers stored within it, and the defendant's second pager, which was obtained the same day after the murder, coupled with Jennifer Rivera's prior photo identification and her prior recorded bail hearing testimony where she positively, without equivocation, identified the defendant in court, there was ample other credible evidence to support the state's case. Add to that the evidence supplied by Jason Burtrado, Detective Marsland, Ed Remy and Hilda Carrasco, along with the defendant's fingerprints on the Blazer, which he attempted to explain away in a most ineffective and suspect fashion, the resulting guilty verdict was well warranted. The jury's verdict in this case was a sensible and responsible one and one which reflects the defendant's guilt beyond a reasonable doubt."

This passage is illustrative of the trial justice's careful deliberation over the de-

fendant's motion in this case. The trial justice determined the credibility of the testifying witnesses and weighed the evidence presented. He placed all these findings on the record. Therefore, we afford his ruling the deference that rightfully is due such a deliberate and conscientious determination. The trial justice did not err in denying the defendant's new trial motion.

## Conclusion

For the reasons set forth herein, we affirm the judgment of the Superior Court. The record shall be remanded to the Superior Court.