STATE

v.

Daniel BOUCHER.

No. 86–490 C.A.

Supreme Court of Rhode Island.

May 17, 1988.

James E. O'Neil, Atty. Gen., Thomas Dickinson, Mary E. Rogers, Asst. Attys. Gen., for plaintiff.

Catherine A. Gibran, Janice M. Weisfeld, Barbara Hurst, Asst. Public Defenders, for defendant.

## OPINION

WEISBERGER, Justice.

This case is before us on appeal by the defendant from a judgment of conviction of murder in the second degree. We affirm.

The facts of the case insofar as pertinent to this appeal are as follows.

On March 9, 1985, the body of the victim, Kathy Demers, was found in the Blackstone River in Woonsocket at the intake grate of the Thunder Mist Hydro-Electric Plant. An autopsy conducted by Dr. Arthur Burns, the Deputy Chief Medical Examiner for the State of Rhode Island, revealed that the victim had died as a result of asphyxia due to strangulation and that the manner of death was homicide. The autopsy further revealed a blood-alcohol level of 0.15.

Kathy Demers (Kathy) was last seen alive early on the morning of New Year's Day, 1985. She and defendant, Daniel Boucher (Boucher), left the home of her mother, Theresa Demers (Ms. Demers), at approximately 8:30 p.m. to celebrate New Year's Eve. The defendant had been living with Kathy and her son in Ms. Demers's home during the Christmas holiday. Ms. Demers testified over defendant's objections that during Christmas week she had asked defendant to move out of her house, which he did. She said that Kathy planned to move to California with her son after the New Year. Ms. Demers further testified that when her daughter left the house on New Year's Eve, she was wearing a tan jacket that Ms. Demers "believe[d]" belonged to defendant.

Testimony by witnesses for the state revealed that the two were seen together in the Woonsocket area that night at the First Avenue Pub, the Hillside Cafe, and at the home of John Beauregard. Testimony revealed also that Kathy and Boucher consumed substantial amounts of beer and also some marijuana and cocaine. John Beauregard testified that Kathy and Boucher left his house at approximately 1:45 a.m. on New Year's Day 1985.

Debra Ethier, who regarded herself as the "best friend" of the victim, was the only witness for the state to claim to have seen Boucher kill Kathy. Ms. Ethier said that both Kathy and Boucher had planned to go to California after the New Year.

Ms. Ethier testified that she first saw Kathy and Boucher on New Year's morn-

ing at approximately 2:15 a.m. After a short conversation on the street corner where they met, the three walked to Ms. Ethier's mother's house to get more beer. Upon arriving, Boucher waited outside while the two women went into the house. While inside the house, Kathy informed Ms. Ethier that Boucher could not go to California with her. After returning with the beer, Ms. Ethier testified that they went underneath the Bandwagon Bridge to the riverbank, where the three consumed the beer and some cocaine.

Ms. Ethier then testified that Kathy told Boucher that he could not accompany her when she went to California. Upon hearing this fact, Boucher started repeatedly slapping and punching Kathy, who began yelling, "Stop it. * * * Stop it." After also urging Boucher to stop, Ms. Ethier became frightened and ran back up the hill to the street. After a few minutes, Ms. Ethier returned to the top of the riverbank, where she saw Boucher rolling Kathy's body into the Blackstone River. Ms. Ethier said she knew it was Kathy's body because she recognized her sneakers, her hair, and the tan jacket Kathy was wearing.

Ms. Ethier said that she did not contact the police because she feared for her own safety. She also told the police in January of 1985 that she did not have any information and that she had not seen Kathy. Ms. Ethier also testified that she thought she had seen Kathy's body in the Blackstone River one morning in the beginning of January but did not call the police. She testified further that she did not contact the police until after Kathy's body was found in March 1985, and she also admitted lying under oath at an earlier hearing when she denied any knowledge of the homicide.

Lucille Botelho and her daughter Kim Lariviere, who live near the Bandwagon Bridge, both testified that they heard a woman screaming late New Year's Eve. Ms. Botelho believed she heard what she described as a woman screaming the words, "Dan, stop it, Danny. Danny, stop it."

Oscar Sevigny, a detective sergeant with the Woonsocket police department, testi-

fied that he had been involved in the search for Kathy. After the body was discovered he said he learned that Boucher was in Florida, to which he had traveled after Kathy's disappearance. Thomas Chute testified that on January 2, 1985, Boucher asked him if he could drive down to Florida with him. Sergeant Sevigny also testified that Boucher was very cooperative with the police.

Carol Boucher, defendant's sister-in-law, testified that on the evening of January 1, 1985, she noticed that one of defendant's hands was swollen around the knuckles. The defendant told her he had injured his hand earlier that day in a fight at the Hillside Cafe. However, Charles McCarthy, a bartender at the bar, testified that he had worked from noon to 6 p.m. on January 1, 1985, and that he could not recall a fight occurring during his shift.

Walter Moody testified that he was Boucher's cellmate at the Adult Correctional Institutions (ACI) for thirty days after Boucher was arrested. Mr. Moody said that during this time Boucher told him that he had killed Kathy.

The jury found Boucher guilty of second-degree murder, and the trial justice sentenced him to life imprisonment at the ACI. Boucher filed a timely appeal from his conviction.

In support of his appeal, defendant raises three issues that will be addressed in the order in which they are presented in defendant's brief. Further facts will be provided as necessary to a determination of the issues.

I

WHETHER THE TRIAL JUSTICE ERRED IN NOT ALLOWING DEFENDANT'S WITNESS, ROBERT COTE, TO GIVE EXPERT TESTIMONY ABOUT THE SHRINKAGE CHARACTERISTICS OF FINISHED GARMENTS

The defendant first argues that the trial justice erred in excluding certain testimony by Mr. Robert Cote concerning the shrinkage characteristics of finished gar-

ments. The state had introduced evidence that Kathy was wearing defendant's jacket on the night she was killed. The defendant attempted to introduce through Mr. Cote an opinion that the jacket found on the victim's body had not shrunk since being immersed in the Blackstone River. In effect the defense theory was that the jacket was too small to fit defendant and thus did not belong to him. The defendant asserts that Mr. Cote had sufficient expertise in the field of textile dyeing and finishing of fabric to offer an expert opinion regarding the shrinkage of the jacket.

This court has long held that the question of whether a witness is qualified to express an opinion as an expert is a matter that is committed to the sound discretion of the trial justice and that the exercise of such discretion will not be disturbed on review by this court absent a showing of abuse. *Mangasarian v. Gould*, 537 A.2d 403 (R.I.1988); *Richardson v. Fuchs*, 523 A.2d 445 (R.I.1987); *Greco v. Mancini*, 476 A.2d 522 (R.I.1984); *Gormley v. Vartian*, 121 R.I. 770, 403 A.2d 256 (1979); *Leahey v. State*, 121 R.I. 200, 397 A.2d 509 (1979); *Schenck v. Roger Williams General Hospital*, 119 R.I. 510, 382 A.2d 514 (1977).

Robert Cote testified that he had forty years of experience as a textile finisher and dyer of fabrics, fibers, and yarns. Mr. Cote also stated that he had studied textile dyeing and finishing for three years at Rhode Island School of Design. He also stated that he worked with fabric prior to the fabric's becoming a finished garment.

Testimony elicited from Mr. Cote on cross-examination regarding his qualifications revealed that he possessed very limited experience regarding the shrinkage of finished garments.

"Q. And what experience, if any, do you have with dealing with measuring shrinkage of an already completed garment?

"A. Very little in measuring of completed garments. The fabric is usually tested for shrinkage, for tensile strength, before it goes to the cutter to be made into a garment.

"Q. So you have very little experience noting how much a completed garment would shrink after it is done?

"A. A completed garment should not shrink if the goods for the garment are properly prepared.

"Q. When you say should not shrink, do you have any experience in documenting or determining, if it does shrink?

"A. Yes. There are standard tests prescribed by the American Association of Textile Chemists and Colorists that specifically state how you test the fabric and what is acceptable in the trade for normal shrinkage.

"Q. Okay. Now, you're talking about the fabric prior—

"A. Prior to it going into a garment.

"Q. What I'm asking is do you have any experience in determining shrinkage of a completed garment?

"A. No, I do not.

"Q. Do you have any experience in determining how much a garment can stretch after being completed?

"A. No, sir."

During continued direct examination by defense counsel, objections from the prosecution were repeatedly sustained by the trial justice on the ground that the questions sought factual determinations relative to the jacket and the witness was not shown to have any knowledge of the facts regarding the finishing of the particular jacket in question.

We believe that the trial justice committed no abuse of discretion in not allowing Robert Cote to testify about the shrinkage characteristics of the jacket found on the body of the victim. The questions as addressed by defense counsel did in fact call for factual determinations concerning the jacket found on the victim's body. The defense counsel sought to have Mr. Cote testify regarding the process used for finishing the fabric from which the jacket was made. However, Mr. Cote was not shown to possess any knowledge regarding the type of material that was used to make the jacket or the process that was used to finish the material prior to its being made into the jacket. An expert's testimony

must be predicated upon facts legally sufficient to form a basis for the expert's conclusion. *Greco v. Mancini*, 476 A.2d at 525; *State v. Fogarty*, 433 A.2d 972, 977 (R.I.1981). In short it was not demonstrated that Mr. Cote had the requisite familiarity with the fabric of the jacket to testify that the garment would not shrink as a result of being immersed in water.

In light of his education, training, and experience, Mr. Cote was qualified to testify, as he did, regarding the general statement that "[a] completed garment should not shrink if the goods for the garment are properly prepared." Beyond this general opinion, however, we believe the trial justice committed no abuse of discretion in not allowing Mr. Cote to testify.

II

WHETHER THE TRIAL JUSTICE ERRED IN NOT ALLOWING A WOONSOCKET POLICE SERGEANT TO TESTIFY CONCERNING REPORTS HE RECEIVED FROM PERSONS WHO CLAIMED TO HAVE SEEN THE VICTIM ALIVE AFTER JANUARY 1, 1985

■ The defendant next alleges that the trial justice erred in not allowing Sergeant Oscar Sevigny to testify regarding the reports he had received from several persons saying that they had seen Kathy alive after January 1, 1985. The trial justice excluded the testimony as inadmissible hearsay upon objection by the prosecution. The defendant maintains that the testimony of Sergeant Sevigny was not offered for the truth of the matter asserted. The defendant argues that he did not seek to prove, through admission of this testimony, that the victim was actually alive and well after January 1, 1985, but merely wanted to show that several reports were made to the authorities about the victim's being alive after New Year's Eve. This argument is transparently unpersuasive. The defendant admits in his brief that this testimony was offered to create "a reasonable doubt" in the minds of the jurors. Achieving this result would necessarily depend upon the jurors' believing that there was at least

some truth to the reports made to Sergeant Sevigny. We therefore conclude that the testimony of Sergeant Sevigny was in fact offered for the truth of the matter asserted and that any subsidiary reason defendant may have had for presenting it is completely outweighed by this purpose.

It is well established that "[g]enerally, an out-of-court statement, oral or written, made by a declarant and offered for the [truth] of the matter asserted constitutes hearsay and is inadmissible in evidence" unless the statement falls within a recognized exception to the hearsay rule. *State v. Brash*, 512 A.2d 1375, 1379 (R.I.1986) (quoting *State v. Coppola*, 502 A.2d 802, 804 (R.I.1985)). After reviewing the exceptions to the hearsay rule we believe it is apparent that none apply to the proffered reports made to the sergeant. Consequently the trial justice was correct in excluding the hearsay testimony offered through Sergeant Sevigny.

III

WHETHER THE TRIAL JUSTICE ERRED IN ALLOWING WITNESSES TO TESTIFY REGARDING MATTERS NOT DISCLOSED TO THE DEFENSE PRIOR TO TRIAL

The defendant next contends that the trial justice erred in allowing the victim's mother to testify regarding the ownership of the jacket found on the victim and about her Christmas week request that defendant move out of her home. The defendant also assigns as error the trial justice's ruling allowing Patrolman Paul Sevigny (not to be confused with Sergeant Sevigny, another police officer) to testify that the size of the victim's upper arms at the time the body was retrieved from the Blackstone River was the same as those of defendant. The defendant argues that this information was not disclosed to him prior to trial, in violation of Rule 16 of the Superior Court Rules of Criminal Procedure, and that as a result defendant had not received any notice, or at least adequate notice, of key portions of their testimony.

"Rule 16 is a 'criminal discovery mechanism [that] attempts to ensure that both parties receive the fullest possible presentation of the facts prior to trial.'" *State v. Ricci*, 472 A.2d 291, 299 (R.I.1984) (quoting *State v. Concannon*, 457 A.2d 1350, 1353 (R.I.1983)). The purpose of Rule 16 is to eliminate surprise and procedural prejudice. *State v. Coelho*, 454 A.2d 241, 245 (R.I.1982). Upon consideration of an alleged nondisclosure, a trial justice, and this court on review, should examine four factors: "(1) the reason for nondisclosure, (2) the extent of prejudice to the opposing party, (3) the feasibility of rectifying that prejudice by a continuance, and (4) any other relevant factors." *State v. Ricci*, 472 A.2d at 299 (quoting *State v. Coelho*, 454 A.2d at 245). The trial justice is in the best position to determine whether any harm resulted from alleged noncompliance with discovery motions and whether the harm can be mitigated. Therefore, his or her ruling should not be overturned absent a clear abuse of discretion. *State v. Coelho*, 454 A.2d at 245. After reviewing the record, we are of the opinion that the trial justice did not abuse his discretion when he decided to admit the challenged testimony.

The information concerning Ms. Demers's proposed testimony about the jacket was provided to defendant as soon as the prosecution learned of it. Ms. Demers, who was present in the courthouse on the morning of the first day of trial, noticed the jacket that the state intended to introduce into evidence. She then told the prosecutor that the jacket had belonged to defendant and that he had let the victim borrow it to wear on New Year's Eve. The prosecutor then provided defendant with a typed summary of the testimony. This information was provided one and a half days before Ms. Demers testified. It appears then that the information was not withheld from defendant either deliberately or negligently. The information was given to defendant as soon as it was discovered. In the event that defendant believed he was prejudiced by this belated disclosure, he could have asked the trial justice for a continuance to prepare to rebut the testimony or diminish its effect. The record indicates that no such request was made. Consequently that issue is not before us.

Regarding Ms. Demers's testimony about her requiring defendant to move out of her home—and the testimony of Patrolman Sevigny concerning the size of the victim's upper arms at the time the body was retrieved from the Blackstone River—we are of the opinion that the nondisclosure was at most inadvertent and that in any event defendant was not prejudiced thereby. Once again in both instances defendant could, but did not, ask for a continuance in order to alleviate or reduce any perceived surprise or prejudice. In addition defendant admitted on the record that he could have counteracted Patrolman Sevigny's testimony regarding the size of the victim's upper arms through further questioning of the medical examiner. The defendant was free to recall Dr. Burns and examine him further. In light of this admission, we feel the failure to exclude the testimony did not constitute prejudicial error.

Moreover, the exclusion of testimony is an extreme remedy and should be applied sparingly. *State v. Rudacevsky*, 446 A.2d 738, 740 (R.I.1982). A trial justice should first determine whether any other available discretionary measures can adequately neutralize the potential for prejudice resulting from the admission of the testimony. In light of the availability of other remedies, most notably that of a continuance, we feel it is not an abuse of discretion for a trial justice to refrain from imposing such a drastic sanction. Accordingly, the defendant's claim for a new trial based upon the asserted violations of Rule 16 must fail.

For the reasons stated, the defendant's appeal is denied and dismissed. The judgment appealed from is affirmed, and the papers in the case are remanded to the Superior Court.