STATE

v.

Jeffrey WILSON

No. 88–207–C.A.

Supreme Court of Rhode Island

Jan. 11, 1990.

James E. O'Neil, Atty. Gen., Jane M. McSoley, Sp. Asst. Atty. Gen., Providence, for plaintiff.

Richard M. Casparian, Public Defender, Barbara Hurst, Chief Appellate Atty., Paula Rosin, Asst. Public Defender, Providence, for defendant.

## OPINION

SHEA, Justice.

The defendant, Jeffrey R. Wilson (Wilson), was convicted of murder in the first degree and unlawful entry. He was sentenced to life imprisonment without parole pursuant to G.L.1956 (1981 Reenactment) § 11–23–2(4), as amended by P.L.1984, ch. 221, § 1. We affirm.

On Monday, May 20, 1985, the victim, Donna Crowell was with Kurt Bowen at his home at 107 Post Road in Westerly, Rhode Island. Bowen testified at trial that he left his house for work on that date at about 2 to 2:10 p.m. When he left, the victim was sunbathing on the deck. Because she could not get a ride home, she was planning to stay over another night at Bowen's house.

Bowen testified that he had called his home from work at around 6 and 7 p.m. but there was no answer. When Bowen returned from work at approximately 11:15 p.m., he noticed that his gun cabinet was broken and the five guns he had stored inside were missing. Bowen then walked to his mother's home, next door, and asked her to call the police.

Lauren Matarese, a Westerly police officer, testified that she responded to the report and met Bowen at his mother's home. Both Bowen and Officer Matarese went to Bowen's cottage. Officer Matarese testified that after entering the house she discovered the victim's body on the back porch.

Doctor William Sturner, chief medical examiner for the State performed the autopsy on the body of Donna Crowell. His examination revealed a total of sixty-four stab wounds to the body, including six cuts to the face, eight in the neck, and nine to the chest and abdomen area. The time of death was estimated by Dr. Sturner to have been between noon and 6 p.m. It was also Dr. Sturner's opinion that the victim's death was not instantaneous, but occurred in a matter of minutes following the stabbing.

Elmore Tucker (Tucker) testified at trial for the state. Tucker stated that in the late afternoon on May 20, 1985, he was on Federal Street in New London, Connecticut when he observed Wilson talking to Randall Proctor (Proctor), Tucker's longtime friend, about selling some guns. Tucker also observed a small reddish stain on Wilson's pants. Following the conversation, Proctor and Tucker drove to a local park followed by defendant. Tucker stayed in the car while Proctor got out and talked to Wilson at the back of the car. Tucker testified that Wilson took several guns out of his trunk and put them in the trunk of Proctor's car.

Tucker also testified that he overheard some of the conversation that took place during this transaction. According to Tucker, Wilson said he hoped he did not get into trouble, that he had had to do something to get the guns. Tucker then claimed that defendant made a motion with

his hand, across his throat, and said that he had "offed" somebody.

Proctor testified that he saw defendant on May 20, 1985, and that Wilson asked him if he was interested in buying some guns. Proctor drove his car to the park accompanied by Tucker. Proctor stated that Wilson took five rifles from his car and put them in Proctor's trunk and Proctor gave defendant $100. During this transaction defendant allegedly stated that he hoped no one else found out about this incident because he had been surprised and "had to made [*sic*] a slash." Proctor testified that defendant made a motion of a finger across his throat.

Proctor testified that after he purchased the weapons he contacted his attorney. At a meeting set up by his attorney with police, Proctor turned over the guns and identified a photograph of defendant as the person who had sold the guns to him.

At trial the state presented testimony from Federal Bureau of Investigation agents Joseph Errera and Patricia Mayes. Agent Errera, qualified as an expert in forensic serology, testified that he found human blood on a shirt seized at the crime scene. This blood could have come from either the victim or defendant, both of whom had type-A blood. Agent Mayes, a fingerprint specialist, testified that defendant's fingerprints taken by the Westerly police matched a set of prints taken from a newspaper seized from the crime scene.

On May 26, 1987, the jury returned a guilty verdict on both the first-degree-murder and unlawful-entry charges. The jury was then instructed to determine whether the murder involved torture or aggravated battery that would allow the trial justice to sentence defendant to life in prison without

parole pursuant to § 11–23–2(4). The jury found that the murder involved aggravated battery.

On appeal defendant argues that the trial justice erred in refusing to pass the case when Tucker testified to incriminatory statements made by defendant. Tucker testified that defendant stated that "he hoped he didn't get into trouble about this; that he had to do something to get these guns." Tucker also indicated that he heard Wilson say that he had "offed somebody." Additionally Tucker testified that he saw defendant draw his hand across his throat in a slashing motion as he spoke.

■ The defendant contends the state's summary of Tucker's testimony provided under Rule 16(a)(7) of the Superior Court Rules of Criminal Procedure does not satisfy the disclosure obligation under Rule 16(a)(1).[1]

A review of the record indicates that in May 1986 the state filed supplemental discovery that included a summary of Tucker's proposed testimony. The summary referred to the fact that Wilson was a passenger in the automobile and that he went with Proctor to the park. The summary also indicated that Tucker would testify that defendant stated he "offed somebody." The summary did not make reference to the slashing motion.

In refusing to pass the case, the trial justice rejected the argument that the state had not met its obligation under Rule 16. Although the trial justice stated that it would "have been better had the state indicated to you the slicing motion, whatever it was, was included in the discovery," he concluded that defendant was not denied adequate notice of the proposed testimony.

1. Rule 16(a) of the Superior Court Rules of Criminal Procedure provides in part:

"Upon written request by a defendant, the attorney for the State shall permit the defendant to inspect or listen to and copy or photograph any of the following items within the possession, custody, or control of the State, the existence of which is known, or by the exercise of due diligence may become known to the attorney for the State:

(1) all relevant written or recorded statements or confessions, signed or unsigned, or

written summaries of oral statements or confessions made by the defendant, or copies thereof;

\*     \*     \*     \*     \*     \*

(7) as to those persons whom the State expects to call as witnesses at the trial, all relevant recorded \* \* \* verbatim statements, signed or unsigned, of such persons and, if no such testimony or statement of a witness is in the possession of the State, a summary of the testimony such person is expected to give at the trial[.]"

■ The purpose of Rule 16 is to eliminate surprise and procedural prejudice at trial. *State v. Coelho*, 454 A.2d 241, 245 (R.I.1982). The summary of Tucker's testimony provided by the state adequately put defendant on notice that he would testify regarding the conversation he had overheard between Proctor and defendant. Additionally the summary specifically indicated that Tucker would testify that Wilson "offed somebody." Although the slashing motion was not specifically referred to, the state had informed defendant that Proctor would testify that during this conversation defendant had made this gesture. Proctor also testified at trial that defendant had made this gesture. Therefore, even if the trial justice erred in allowing Tucker to testify regarding the slashing motion, the testimony was cumulative and would constitute a harmless error.

This court has recognized that the trial justice is in the best position to determine whether any harm has resulted from alleged noncompliance with discovery motions, and his or her ruling will not be overturned absent a clear abuse of discretion. *State v. Boucher*, 542 A.2d 236, 241 (R.I.1988). After reviewing the record, we are of the opinion that the trial justice did not abuse his discretion when he admitted the challenged testimony.

■ The defendant next contends that the trial justice erred in allowing Dr. Robert Harrison to testify concerning the age of a laceration he observed on defendant's abdomen. On May 23, 1985, defendant was brought to Westerly Hospital in order to obtain a blood sample and was examined by Dr. Harrison. Prior to trial defendant was notified by the state that Dr. Harrison said that the "wound was caused by a sharp object and was mildly infected with a small amount of purulent exudate present and mild redness present." An internal investigative summary prepared by the State Police and provided to defendant also makes reference to the fact that Dr. Harrison did not stitch the wound because it was "over six hours old." Over the objection of defendant, Dr. Harrison was permitted to testify that the wound "was certainly more than 24 hours old and probably more than 48."

The defendant also claims that because the state did not specifically disclose the fact that Dr. Harrison would testify concerning the age of the wound, the trial justice should not have allowed him to testify on that issue. The defendant's argument that he was unfairly surprised by this question is not persuasive. Because the age of this wound was obviously material, it should have been apparent to defendant that this issue would be addressed by Dr. Harrison during his testimony even if it was not specifically disclosed prior to trial. The trial justice was acting well within his discretion when he allowed Dr. Harrison to testify concerning the age of the wound. Accordingly no error was committed.

■ The defendant next claims that it was an error for the trial justice to refuse to allow defendant to impeach Tucker's testimony through the admission of previous criminal convictions. At a voir dire hearing Tucker testified that in 1974 he had been convicted of robbery, larceny and forgery in Connecticut for which he received a two-to-five year sentence. Citing remoteness as a reason, the trial justice would not permit defendant to question Tucker at trial concerning these convictions.

Because this case was tried prior to October 1, 1987, the effective date of the Rhode Island Rules of Evidence, only G.L.1956 (1985 Reenactment) § 9–17–15 is applicable.[2] This court has held that remoteness is the sole basis upon which a trial justice can prohibit the use of a prior conviction of any crime to impeach the credibility of a witness. *State v. Lariviere*, 527 A.2d 648 (R.I.1987). In this case the conviction occurred approximately thirteen years prior

2. General Laws 1956 (1985 Reenactment) § 9–17–15 provides:
   "No person shall be deemed an incompetent witness because of his conviction of any crime, or sentenced to imprisonment there- fore; but shall be admitted to testify like any other witness, *except that conviction or sentence for any crime or misdemeanor may be shown to affect his credibility.*" (Emphasis added.)

to the trial. Furthermore, except for a single traffic offense, driving without a license, Tucker had not been convicted of a crime in the intervening years. Consequently we conclude that the trial justice did not abuse his discretion when he did not allow defendant to impeach Elmore Tucker through the use of these criminal convictions.

The defendant also argues that it was error for the trial justice to permit evidence that a state witness was reluctant to cooperate with the prosecution because he was in fear of his life and also for providing inadequate cautionary instructions to the jury.

During cross-examination, Elmore Tucker stated he had given a written statement to a member of the Attorney General's office. The prosecutor told the court that he had no knowledge that a written statement existed, but that Tucker may have been referring to hand-written notes taken by Christopher Gontarz, the original prosecutor in the case. Gontarz in turn testified that he had taken notes when he met with Tucker, but no written statement was made.

At trial defendant called Gontarz to testify in order to impeach Tucker. On cross-examination of Gontarz the prosecutor inquired as to why Tucker was not asked to sign the notes. Gontarz testified that Tucker was reluctant to become involved in the case. The prosecutor then asked:

"Q. And when you say he was reluctant, what do you mean by that?

"A. He was in fear for his life.

"Q. And did he express that to you?

"A. Yes, he did.

"Mr. DiLauro: Objection your honor.

"The Court: I will sustain that objection.

"Mr. DiLauro: Move to strike the previous answer then, your Honor please.

"Mr. Pine: Objection your honor to the motion to strike. I was asking a question on what basis he was reluctant.

"The Court: Objection—your request is denied, Mr. DiLauro."

A side bar conference then took place at which the trial justice indicated that he was concerned about the statement elicited from Mr. Gontarz regarding Tucker's fear. The trial justice also faulted the defense counsel for failing to object. However, the trial justice agreed to instruct the jurors to disregard the response. After returning from the luncheon recess, the trial justice gave the following cautionary instruction:

"[T]here was a matter that came up during Mr. Gontarz's testimony that I do want to address myself to. There was a response to a question that was put to Mr. Gontarz as to the reluctance of Mr. Tucker to sign statements. And, Mr. Gontarz answered that it was because he was fearful for his own safety; that is to say Tucker said that. I'm going to tell you that you should not consider that. That is stricken."

In his original brief defendant argued that the cautionary instructions were insufficient. The defendant in his reply brief appears to change his position and argues that the instructions were untimely. After reviewing the record we are of the opinion that the cautionary instruction was proper and not so untimely as to be ineffective.

Finally defendant also argues that the sentence of life imprisonment without parole was improperly imposed. Specifically, defendant argues that the trial justice erred in refusing to allow statements regarding defendant's drug use, which had been excluded from evidence, to be read to the jury when it considered imposing the sentence of life without parole. This argument is without merit. As this court has often stated, most recently in *State v. Lassor*, 555 A.2d 339, 354 (R.I.1989), the trial justice, not the jury, has sentencing authority. Therefore, there is no point in asking the jury to consider mitigating circumstances when it has no authority to impose or withhold the sentence of life imprisonment without parole. *Id.*

In addition defendant claims that the trial justice erred in defining the term "aggravated battery." He instructed the jury in the following manner:

"First, let's start with the term 'battery.' When I do that, I have to refer back yet

once more to the term 'assault.' The term 'assault' means an unlawful attempt or offer of force or violence to do bodily injury to another person. The term 'unlawful' means without lawful authority, or justification to commit the act without the consent of the person against whom the assault is directed. A 'battery' is the physical result of the accomplished assault that is to say, a consummation of the assault. The term 'aggravated' refers to making an existing situation worse or more serious, or more severe."

Relying on our holding in *Lassor*, defendant claims that the definition provided by the trial justice is legally incorrect. In *Lassor* this court held that the term "aggravated battery" is not so unconstitutionally vague as to prevent the imposition of the sentence of life without parole. In reaching this conclusion we noted that the term "aggravated battery" has been recognized by the United States Supreme Court as constituting the malicious causing of bodily harm to another by depriving him of a member of his body or by rendering a member of his body useless or by seriously disfiguring his body or a member thereof. *Id.* (citing *Godfrey v. Georgia*, 446 U.S. 420, 431–32 n.13, 100 S.Ct. 1759, 1766 n.13, 64 L.Ed.2d 398, 408 n. 13 (1980)). This court, however, did not conclude that that particular definition is binding upon courts in this state. We are of the opinion that the definition provided by the trial justice gave adequate assistance to the jury.

The defendant also argues that the statute that authorizes life imprisonment without parole fails to define aggravating and mitigating circumstances and thereby could lead to arbitrary and capricious application of the statute. In *State v. Travis*, 568 A.2d 316 (R.I.1990), this court rejected that argument.

Finally, defendant urges the court to reduce the penalty from life imprisonment without parole to life imprisonment. When considering this request this court exercises independent judgment and discretion. We examine the record, the findings of the trial justice, and the personal history, character, record, and propensities of a defendant.

Prior to sentencing defendant, the trial justice stated:

"With regard to the nature and circumstances of the murder which was tried before me, this was as savage and as brutal a killing as could be imagined. This victim was stabbed 65 times in a barbaric fashion."

In addition the trial justice considered the fact that defendant had a criminal record and reviewed the psychological evaluation which concluded that defendant exhibited "antisocial behavior." The trial justice found that there was no evidence that defendant was suffering from an emotional or mental disturbance at the time he committed the crime.

Given the viciousness of this crime, we are of the opinion that the trial justice's decision to impose life imprisonment without parole was supported by ample evidence and was entirely appropriate. In the exercise of our independent judgment we affirm the imposition of that sentence.

For the reasons stated, the defendant's appeal is denied and dismissed, the judgment appealed from is affirmed, and the papers of the case are remanded to the Superior Court.