**Supreme Court**

No. 2015-238-C.A.

(P1/13-2586AG)

State                         :

v.                          :

Nigel Nichols.                  :

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                                  :

v.                                  :

Nigel Nichols.                     :

Present:  Suttell, C.J., Goldberg, Robinson, Flaherty, and Indeglia, JJ.

## O P I N I O N

**Chief Justice Suttell, for the Court.**  On December 6, 2009, David Thomas, on leave from the Army, and Domingo Ortiz, both of whom were twenty-two years old, were mercilessly gunned down and killed in front of the Garrahy Judicial Complex in Providence (Garrahy Complex) in a senseless act of depravity.  A third victim, then eighteen-year-old Dwayne Thomas, was shot seven times but survived with permanent injuries.[1]  The defendant, Nigel Nichols, was ultimately arrested, charged, and convicted of these inexplicable crimes.  He now appeals from the Superior Court judgment of conviction of two counts of first-degree murder, one count of felony assault, and three counts of discharging a firearm during a crime of violence.  For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Procedural History

On December 5, 2009, David, Dwayne, and Ortiz planned for a night of "having a good time[,] * * * [d]ancing" and "having fun" at Club Ultra in downtown Providence.

---

[1] David Thomas and Dwayne Thomas were brothers.  We refer to them by their first names to avoid confusion.

On this particular weekend, David was visiting home from his military base at Fort Drum, New York; it was Dwayne's first time attending a nightclub.

In the early morning hours of December 6, 2009, after an incident-free evening of "dancing, meeting new friends and just having a good time," the club closed, and the trio proceeded directly to a parking lot to procure David's car and return home to Boston. In the car, David drove, Dwayne sat beside him in the passenger seat, and Ortiz sat behind Dwayne in the rear passenger seat. After exiting the parking lot, David's sedan continued onto Dorrance Street, in the direction of Interstate 95 North's entrance ramp, towards Boston. At the corner of Clifford and Dorrance Streets—in front of the Garrahy Complex—the vehicle came to a stop at a red light.

Dwayne testified that, while "waiting for the light to turn green," he observed David "texting one of his friends" and "the next thing [he] kn[e]w, all [he] hear[d] [was], 'What the F[uck] you looking at?'" Attempting to "see what was going on," Dwayne arose to a fusillade of gunfire. He heard his brother "moaning * * * because he [was] in so much pain" and then Dwayne "blacked out." Dwayne further testified that when he regained consciousness he had to muster "all [his] strength" to open the passenger door, exit the vehicle, and yell to bystanders that his brother "got shot * * * [and] needs help," before collapsing on the ground. Twenty-two .40-caliber shell casings were subsequently recovered from the crime scene, all of which were fired from a semiautomatic weapon.

Devon Boswell, who considered defendant to be his "best friend" and "brother," testified that on December 5, 2009, he, defendant, Kevin Innocent, and Kerron Phillip left Boston and traveled to Providence to attend a nightclub. According to Boswell's testimony, both he and defendant left their homes with a firearm that night: Boswell

carried a .45-caliber Taurus 911 and defendant a .40-caliber Glock 23 with a fifteen-round magazine as well as an extended magazine, capable of holding thirty rounds of ammunition, which they stowed behind the radio in Boswell's vehicle.

Boswell said they arrived at Level 2 nightclub in Providence before midnight. Boswell and defendant left their firearms in the vehicle before entering the club. According to Boswell, they socialized in the club, hung out, consumed "a few drinks," and met some friends with whom he and defendant had attended high school. Boswell testified that at some point during the evening he said to defendant, "Snag is crazier than you," referring to a March 2009 incident in Boston in which a Keron "Snag" Pierre shot and killed "[t]wo girls [and] one boy," all of whom were under the age of twenty-one. This comment caused defendant to become very upset; he responded "Snag is a bitch. He kills women and children." According to Boswell, defendant was furious and "looking to fight somebody right away." Boswell stayed close to him to make sure "he didn't do anything or fight anybody."

Approximately forty or forty-five minutes later, the club closed. As defendant and his friends were descending the stairs to leave, they became involved in an altercation with another club patron. Boswell testified that defendant "started swinging at the guy," and then the entire group "started to beat up on" him for about fifteen to twenty seconds until security pushed them down the stairs. Eventually, the group returned to Boswell's vehicle and proceeded to drive home to Boston.

Shortly thereafter, while driving in Providence traffic, Boswell's car was sideswiped by an SUV. According to Boswell's testimony, the SUV attempted to leave the scene, so Boswell drove up and pulled in front of the SUV to secure it. Boswell said

that he started fighting with the driver of the SUV, and defendant jumped on top of the SUV and kicked in the windshield. After some time, Boswell, defendant, and the rest of the party returned to Boswell's vehicle and continued to drive to Boston.

Boswell testified that, before they reached Interstate 95 North, defendant received a call and directed Boswell to stop, prompting Boswell to pull over in front of the Garrahy Complex. There, two other vehicles arrived occupied by the acquaintances who had met Boswell and defendant earlier at Level 2. Shortly thereafter, another vehicle pulled up, driven by Kevin Innocent's girlfriend, Rachel Regis. Boswell testified that defendant was visibly upset when speaking to one of his friends on the sidewalk. Boswell further testified that defendant went into Boswell's car to retrieve his firearm. Boswell testified that he "[saw] [defendant] * * * [p]ull the radio out, le[ave] the radio hanging, [and] * * * grab[ ] his gun," and "[take] the 15-round clip out and * * * grab[ ] the extended magazine and put * * * the magazine in the gun."

A vehicle then pulled in front of the Garrahy Complex and stopped at a red light. Boswell testified that the vehicle was a four-door sedan with three male occupants, all of whom appeared to be between the ages of eighteen and twenty-five. According to Boswell, defendant then said, "[w]hat the fuck are you looking at?" as he stared at the vehicle and opened fire.

Boswell testified that, after firing several shots, defendant "got into [his] car" and everyone that had congregated in front of the Garrahy Complex entered their vehicles and left. On their way back to Boston, according to Boswell, defendant "screamed out, 'Body number 8, left three of them slumped.'"

Providence Police Sgt. Robert Yekelchik, who at the time was a detective assigned to the BCI division, was patrolling the area of Providence in the early morning hours of December 6, 2009. At approximately 2:30 a.m., Sgt. Yekelchik responded to a call indicating that there had been a shooting outside of the Garrahy Complex. Upon arrival, Sgt. Yekelchik saw a sedan with two male victims inside. He testified that the victims had apparently been shot and appeared to be deceased. Thereafter, the sergeant secured the scene and collected the spent shell casings. Sergeant Yekelchik testified that all of the shell casings "start[ed] from the passenger side of the vehicle and they appeared to be ejecting towards the front of the vehicle"—indicating that the shooter was on the passenger side of the vehicle because most semiautomatic weapons eject to the right when fired. In total, Sgt. Yekelchik collected twenty-two casings, all of which were .40 caliber. The sergeant subsequently submitted the shell casings to the Rhode Island State Crime Lab (crime lab) for analysis. At trial, Sgt. Yekelchik testified that the shell casings were indicative of being from a semiautomatic firearm and that they also had a unique rectangular mark on them.

Neil Clapperton, a criminalist employed by the crime lab, testified that the crime lab received twenty-two shell casings and thirteen projectiles from the Providence police in December 2009. In addition, Clapperton testified that he also received a .40-caliber extended, high-capacity magazine from the Providence police department for analysis. According to Clapperton, the extended magazine is capable of holding thirty cartridges and was specifically designed for .40-caliber ammunition, but was also capable of holding 9-millimeter ammunition. The criminalist's goal was to determine whether the extended magazine fit a Glock pistol and to analyze the markings the magazine left on

the ammunition to determine whether the extended magazine created the rectangular marks on the cartridges. Clapperton determined that the extended magazine fit a Glock firearm "well," but he stated that he could not conclusively determine that the shell casings found at the crime scene had once been housed in that particular magazine.

Providence Police Det. Angelo A'Vant was assigned to investigate this case in October 2011. He testified as to the difficulties he had in locating several key witnesses in this case. Nonetheless, Det. A'Vant testified that he traveled to Boston to elicit testimony from Kevin Innocent and his girlfriend, Rachel Regis. According to Det. A'Vant, Regis stated that she saw defendant with a gun in his hand on the night of the shooting.[2] Detective A'Vant testified that Regis then "pointed to [his] firearm and she said, [i]t was a lot bigger than the one [Det. A'Vant] ha[d] on [his] side," and she continued pointing to the hand grip of the firearm and specifically indicated, using her fingers, that that portion "was a lot larger."

On February 18, 2015, a jury convicted defendant of two counts of first-degree murder, one count of assault with a dangerous weapon, and three counts of discharging a firearm during a crime of violence resulting in injury or death. The defendant filed a motion for a new trial, which was denied. The trial justice then sentenced defendant to the maximum allowable prison term—four consecutive life sentences, followed by two consecutive twenty-year sentences.[3] The defendant timely appealed.

---

[2] At trial, Regis testified that she did not remember seeing defendant with a firearm on the night of the shooting.

[3] The defendant was sentenced to two consecutive life terms under G.L. 1956 § 11-23-1, murder; in addition to two consecutive life sentences under G.L. 1956 § 11-47-3.2(b)(3), discharging a firearm when committing a crime of violence; and two terms of twenty years, also consecutive, under G.L. 1956 § 11-5-2(a), felony assault, and § 11-47-3.2(b), for discharging a firearm when committing a crime of violence.

## II

### Standard of Review

It is well established that decisions concerning the admissibility of evidence are "within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of that discretion is apparent." State v. Mohapatra, 880 A.2d 802, 805 (R.I. 2005) (quoting State v. Grayhurst, 852 A.2d 491, 504 (R.I. 2004)). "The trial justice will not have abused his or her discretion as long as some grounds supporting his or her decision appear on the record." State v. Evans, 742 A.2d 715, 719 (R.I. 1999).

## III

### Discussion

#### A

#### Admission of the High-Capacity Magazine

On appeal, defendant contends that the trial justice erred as a matter of law in admitting into evidence the extended, high-capacity magazine based on the expert testimony of Clapperton. The magazine in question was seized from defendant's home by Det. Gregory Brown of the Boston police department, pursuant to a search warrant executed on October 19, 2011—nearly two years after the shootings. Before the commencement of trial, defendant filed a motion in limine seeking to exclude the magazine from the evidence because it "ha[d] no arguable relevance to any issue in the case." The trial justice denied the motion.

At trial, Clapperton testified that the magazine seized from defendant's home was capable of holding thirty .40-caliber cartridges. He was unable to state with certainty,

however, that the twenty-two shell casings found at the crime scene had come from that particular magazine; the results of his examination, rather, were inconclusive.

On appeal, defendant argues that the trial justice erred in admitting the high-capacity magazine and Clapperton's expert testimony related thereto. He asserts that Clapperton could not establish within a reasonable degree of scientific certainty that the magazine seized by the Boston police was linked to the Providence homicides, nor were his test results probative as to whether the magazine was in fact used in the murders. Thus, defendant posits, the jury was allowed to speculate as to whether the magazine was connected to the crimes for which he was being tried.

The fact that the state was unable to establish conclusively that the magazine seized from defendant's home was the same magazine used in the shootings, or that the spent shell casings were ejected therefrom, however, does not preclude its admission into evidence. Such considerations may properly be evaluated by the trier of fact in determining the weight to be given to the evidence, but they do not affect its admissibility. See State v. Rios, 996 A.2d 635, 640 (R.I. 2010) ("evidence was relevant despite [witness]'s inability to say definitively that the handgun he had seen [the] defendant carry was the same as the * * * firearm he described as the murder weapon"); State v. Reyes, 984 A.2d 606, 615, 616 (R.I. 2009) (affirming trial justice's ruling that "probability exists" that handgun found near crime scene and shell casings found at crime scene were used to murder [the] victim when a firearms expert testified that, "although he could not say with certainty that the * * * handgun fired the bullets that caused [the victim]'s death, the bullets were consistent with and could have been fired from that weapon").

- 8 -

In the instant case, the twenty-two .40-caliber shell casings found at the scene and the manner in which the witnesses described the shooting, were consistent with the use of an extended, high-capacity magazine. Significantly, Boswell testified that defendant had stashed two .40-caliber Glock handgun magazines, one capable of holding thirty rounds of ammunition, in Boswell's car that evening. Boswell had also observed defendant retrieve the gun, remove the fifteen-round clip and replace it with the extended magazine. Boswell further testified that defendant later told him that he had "buried" the Glock because "[i]t had so many bodies on it." He also testified that defendant said that he would never get rid of the extended magazine because "[t]hose were hard to come by."

In denying defendant's motion in limine, the trial justice said that he thought "there [was] a clear nexus to that which [was] found in * * * defendant's apartment, even though it[ ] [was] a couple, three years down the road." The trial justice also noted that "[i]f he ha[d] a fondness and a liking for this particular magazine, and * * * it's a type of magazine that would have held as many shots as were fired during the course of the shooting in 2009, [he thought] it[ ] [was] clearly admissible." The trial justice also found that its probative value outweighed any prejudice to defendant.

Based upon our review of the record, we are of the opinion that the trial justice was acting well within his discretionary authority when he admitted the evidence. Here, the jury was capable of sifting through the evidence that defendant was in possession of a high-capacity magazine, that he was seen inserting it into his .40-caliber Glock just prior to the shooting, and that the number of shell casings found at the crime scene were consistent with the use of such a magazine. The jury was then entitled to weigh the evidence against the state's inability to establish that the magazine seized from

defendant's apartment two years later was in fact the same magazine used to murder David Thomas and Domingo Ortiz and grievously injure Dwayne Thomas. Accordingly, we perceive no error in the trial justice's evidentiary ruling.

**B**

**Rule 16 Violations**

Next, defendant argues that the trial justice violated Rule 16 of the Superior Court Rules of Criminal Procedure when he admitted certain testimony of Boswell, Det. A'Vant, and Clapperton.

"Rule 16 governs discovery procedures in criminal trials." State v. Santiago, 81 A.3d 1136, 1140 (R.I. 2014). "The overarching purpose of Rule 16 is 'to ensure that criminal trials are fundamentally fair.'" Santiago, 81 A.3d at 1140 (quoting State v. Briggs, 886 A.2d 735, 754 (R.I. 2005)). "The rule strives to avoid surprise at trial." Id. "It includes a requirement that '[w]hen a criminal defendant requests discovery material concerning witnesses the state may call to testify at trial, Rule 16 obligates the state to produce only prior recorded statements of a witness, a summary of the witness's expected trial testimony, and any records of prior convictions.'" Santiago, 81 A.3d at 1140 (quoting Briggs, 886 A.2d at 754).

"Significantly, Rule 16 also imposes a continuing duty to disclose." Santiago, 81 A.3d at 1140. "This duty requires a party, having previously complied with requests for discovery, to 'promptly notify the other party of the existence' of 'additional material previously requested which is subject to discovery or inspection under this rule[.]'" Id. (quoting Rule 16(h)). "The rule permits a trial justice to prohibit witnesses from testifying if their identities or their statements were not disclosed to the requesting party."

Id. (quoting State v. Ricci, 639 A.2d 64, 68 (R.I. 1994)). Accordingly, "[t]he appropriateness of a sanction under Rule 16 can be determined only after the trial justice has considered (as must this Court on review) the following factors: '(1) the reason for nondisclosure, (2) the extent of prejudice to the opposing party, (3) the feasibility of rectifying that prejudice by a continuance, and (4) any other relevant factors.'" State v. Perez, 882 A.2d 574, 585 (R.I. 2005) (quoting State v. Coelho, 454 A.2d 241, 245 (R.I. 1982)).

"It is well established that, when this Court reviews questions regarding claimed Rule 16 discovery violations, 'the applicable standard is narrow: [T]he trial justice must have committed clear error.'" Santiago, 81 A.3d at 1139 (quoting Briggs, 886 A.2d at 755). "The trial justice is in the best position to determine whether any harm resulted from alleged noncompliance with discovery motions and whether the harm can be mitigated." Id. (quoting State v. Boucher, 542 A.2d 236, 241 (R.I. 1988)). "Therefore, '[w]e accord great deference to the trial justice's decision regarding whether a violation of Rule 16 occurred.'" Id. at 1139-40 (quoting State v. Marmolejos, 990 A.2d 848, 852 (R.I. 2010)). "The discovery ruling of a trial justice 'will not be overturned absent a clear abuse of discretion.'" Id. at 1140 (quoting State v. Farley, 962 A.2d 748, 753 (R.I. 2009)).

### 1. Devon Boswell

In particular, defendant takes issue with the trial justice's admission of Boswell's testimony that he saw defendant take the pistol out from behind the radio console in Boswell's car, remove the magazine from the firearm, and insert the extended magazine because such testimony was "neither disclosed by the [s]tate in discovery, nor per its

continuing duty."[4]  Conversely, the state asserts that defendant is not entitled to a new trial because he fails to aver how the alleged discovery violations were intentional and how the "alleged violations contributed to his conviction."

Our review of the record reveals no reason to disturb the trial justice's rulings. After defendant's objection to Boswell's testimony that defendant took one clip out of the gun and put the extended magazine in, the trial justice explained that, "as [he] recall[ed], the discovery indicate[d] that he used the extended magazine when he was doing the shooting."  Upon defendant clarifying his objection to "new testimony that one [magazine] was in the gun and one wasn't," the trial justice indicated that, if the extended magazine was used in the shooting, it was "not terribly novel, new or surprising that one [magazine] was substituted for the other," and determined that it was not a "prejudicial[ ] surprise" or could even be "character[ized] as [a] surprise."  We have long recognized that a "trial justice is in the best position to determine whether any harm result[s] from [an] alleged noncompliance with [a] discovery motion * * *." Santiago, 81 A.3d at 1139 (quoting Boucher, 542 A.2d at 241).  Here, we perceive no abuse of the trial justice's discretion in admitting Boswell's testimony.

### 2. Detective Angelo A'Vant

Next, defendant argues that Det. A'Vant's testimony regarding Regis's description of defendant's weapon, viz., that Regis pointed to the hand grip of the

---

[4] The defendant also contends, without much discussion, that Boswell's testimony, that defendant "screamed out 'Body number 8, left three of them slumped'" on their way back to Boston, was not disclosed to him before trial by the state.  What had been disclosed to the defense, in a report from Det. A'Vant, however, was that defendant had made a similar statement to Boswell "shortly after the shooting."  At trial, defendant argued that the disclosure did not place the statement in its proper context, i.e., that it was said in the car on their way back to Boston.  The term "shortly," he argued, could mean days or it could mean weeks.  We perceive no merit to defendant's contentions.

detective's weapon and indicated that the grip of defendant's firearm was longer, was not disclosed to defendant under Rule 16.

We conclude, however, that the trial justice's ruling was supported by the evidence and that he conducted an appropriate analysis under Rule 16. At sidebar, defendant indicated that Det. A'Vant's testimony was going "to elaborate on [the firearm's] description beyond what[ ] [was] in the report." The trial justice concluded that the testimony was "not new evidence" because "[t]here [was] other evidence that was given in discovery about the size of the gun and the magazine" and that Regis's description of the firearm was "in the report * * * offered in the interview of February 3rd, 2015." The trial justice then supported his decision by stating that "[t]here was a reference to [Regis] having seen the gun and asking her to describe it, and * * * she was much more specific when she spoke to [Det.] A'Vant, and I will permit him to testify to it." Again, we perceive no error in the trial justice's ruling.

### 3. Criminalist Neil Clapperton

Finally, defendant avers that the trial justice improperly allowed Clapperton's testimony concerning the rectangular markings on the shell casings and the extended magazine's compatibility with both 9-millimeter and .40-caliber ammunition because the report submitted by Clapperton in discovery did not include these items. As a result, defendant maintains that he was caught by "surprise" at trial. The state contends that defendant was aware of this testimony because Clapperton's report did in fact include that 9-millimeter ammunition could be loaded into the extended magazine and, furthermore, that, although the report was silent on the markings on the spent shell

- 13 -

casings, the jury had already heard testimony from Clapperton regarding this without objection from defense counsel.

At trial, defendant's objection to the testimony of Clapperton was entertained at a lengthy sidebar. The state read from Clapperton's report that "[t]he extended magazine from item 39 was used to load four laboratory cartridges of caliber [9]-millimeter." The defendant argued that he had no way of knowing from the report which of the three magazines that had been sent to the crime lab for inspection was tested with 9-millimeter cartridges. In overruling defendant's objection, the trial justice noted that "it's this particular clip that the [s]tate [h]as always targeted as being the relevant clip" and that the testing by Clapperton with 9-millimeter cartridges was in the report. We cannot say that the trial justice abused his discretion in allowing Clapperton's testimony. Moreover, on appeal, defendant fails to show how he was prejudiced thereby.

## C

### Batson Peremptory Challenge

During jury selection, the state used its peremptory challenges to strike several potential jurors, including Juror No. 110. The defendant, who identifies as African-American, immediately objected to the state striking Juror No. 110, who defendant claims was Hispanic.[5] The trial justice indicated that he "tend[ed] not to agree with [defendant]"and that, in his opinion, there were not any Batson issues whatsoever, but he nonetheless asked the state to proffer its race-neutral reasons for the strike. See Batson v. Kentucky, 476 U.S. 79, 96 (1986).

---

[5] The record is not clear whether Juror No. 110 is in fact Hispanic. Before the jury was impaneled, the trial justice indicated that he did not know whether Juror No. 110 was Hispanic and that "[h]e very well might be Italian with that name."

In response to the trial justice's inquiry, the state offered two purportedly race-neutral explanations for challenging Juror No. 110. First, the state was concerned that Juror No. 110 had some knowledge of the legal system because he had "two friends in [the Attorney General's] [O]ffice, as well as in the criminal defense [bar]," and he had asked a question during voir dire concerning circumstantial and direct evidence. Second, the state alleged that Juror No. 110 "appear[ed] to be a leader on the jury" and therefore might influence other jurors.

The trial justice then permitted defendant to challenge the state's reasons. The defendant countered that there were other potential jurors "who ha[d] all the characteristics that [the state] described" and that there had been instances where other potential jurors "asked questions about [the] law" and knew defense attorneys and people in the Attorney General's Office. In closing, defendant proclaimed that the reasons for challenging Juror No. 110 were "individually and collectively * * * pretextual" and that "the real reason for the challenge" was that Juror No. 110 was "a minority."

After hearing the parties' arguments, the trial justice allowed the state's peremptory challenge, indicating to defendant that:

> "I don't join your concerns as to whether this is a juror who invites a <u>Batson</u> discussion at all, and even if it did invite <u>Batson</u>, I'm satisfied that the reasons offered by [the state] are credible, sensible and not at all pretextual for striking him."

The defendant argues that the trial justice erred in dismissing the juror pursuant to the state's peremptory challenge, which defendant contends was in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Particularly, defendant contends that the real reason for the prosecution's challenge was

the juror's race and was thus "pretextual in nature, and not race-neutral." Conversely, the prosecution avers that the trial justice was not clearly wrong in accepting the prosecution's race-neutral reasons for using a peremptory challenge to strike the potential juror.

The Equal Protection Clause of the Fourteenth Amendment "guarantees the defendant that the [s]tate will not exclude members of his [or her] race from the jury venire on account of race[.]" State v. Pona, 66 A.3d 454, 472 (R.I. 2013) (Pona II) (quoting State v. Pona, 926 A.2d 592, 601 (R.I. 2007) (Pona I)). "To determine whether a defendant has been deprived of this guarantee by the state's use of a peremptory challenge, we employ Batson's familiar tripartite test." Id. "First, the defendant must 'establish a prima facie case of purposeful discrimination[.]'" Id. (quoting Pona I, 926 A.2d at 601). "Upon such a showing, the burden shifts to the prosecution to articulate its race-neutral reason(s) for challenging that particular juror." Id. (quoting State v. Price, 706 A.2d 929, 935 (R.I. 1998)). "Finally, '[t]he trial court is then left to determine whether the defendant has carried his or her burden of proving purposeful racial discrimination.'" Id. (quoting Price, 706 A.2d at 935).

Accordingly, "[t]he trial justice's evaluation of the prosecutor's state of mind is accorded great deference." Pona II, 66 A.3d at 472 (quoting Price, 706 A.2d at 935). "Thus, the 'ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous.'" State v. Gallop, 89 A.3d 795, 804 (R.I. 2014) (quoting Pona II, 66 A.3d at 472).

Based upon our review of the record, we are satisfied that the trial justice's decision regarding the peremptory challenge to Juror No. 110 was not clearly erroneous

and was supported by the record. In this case, we will assume that <u>Batson</u>'s first prong is met because, upon defendant's peremptory objection, the trial justice required the state to offer its race-neutral reasons for the strike. <u>See</u> <u>Pona I</u>, 926 A.2d at 607 ("Although the trial justice did not state explicitly whether [the] defendant made a <u>prima</u> <u>facie</u> showing of purposeful discrimination * * * 'the preliminary issue of whether * * * [the] defendant had made a <u>prima</u> <u>facie</u> showing [became] moot'") (quoting <u>State v. Austin</u>, 642 A.2d 673, 678 (R.I. 1994)). Further, the record is clear as to the state's race-neutral reasons proffered at trial, which satisfies the second prong. Therefore, the issue before this Court is whether the state's proffered reasons were pretextual in nature.

Here, defendant has offered no evidence to disturb the trial justice's evaluation of the prosecutor's stated reason for striking the juror, other than claiming that Juror No. 110's last name was perhaps Hispanic and that other potential jurors had similar friendships with lawyers in the bar. The trial justice, however, was satisfied with the state's presentation and reasonably determined that the challenges were "credible, sensible and not at all pretextual." We cannot say that the trial justice erred in so finding.

**D**

**Motion for New Trial**

Lastly, defendant avers that the trial justice incorrectly determined that the testimony supported a conviction of first-degree murder because the prosecution's case relied primarily on the testimony of Boswell, whose testimony defendant described as "quite unworthy of belief" due to his lack of candor to the court. Additionally, defendant argues that the testimony of Michael James, Kevin Innocent, and Rachel Regis, whom the

- 17 -

prosecution also relied upon, were also unworthy of belief because of the witnesses' reluctance to testify and similar lack of candor to the tribunal.

"When considering whether or not to grant or deny a motion for a new trial, 'the trial justice acts as a thirteenth juror.'" State v. Texieira, 944 A.2d 132, 140 (R.I. 2008) (quoting State v. Imbruglia, 913 A.2d 1022, 1028 (R.I. 2007)). "In dealing with a motion for a new trial, 'the trial justice must (1) consider the evidence in light of the jury charge, (2) independently assess the credibility of the witnesses and the weight of the evidence, and then (3) determine whether he or she would have reached a result different from that reached by the jury.'" Id. (quoting State v. Morales, 895 A.2d 114, 121 (R.I. 2006)). "If the trial justice concludes that reasonable minds could differ as to the result or if the trial justice reaches the same conclusion as the jury did, the verdict should be affirmed and the motion for a new trial denied." Id. "If the trial justice does not agree with the jury's verdict, 'the trial justice must * * * determine whether the verdict is against the fair preponderance of the evidence and fails to do substantial justice.'" Id. (quoting State v. Banach, 648 A.2d 1363, 1367 n.1 (R.I. 1994)).

"On review, we accord great weight to a trial justice's ruling on a motion for a new trial if he or she has articulated sufficient reasoning in support of the ruling." Texieira, 944 A.2d at 140-41. "This Court will not overturn a trial justice's determination with regard to such a motion unless we determine that the trial justice committed clear error or that he or she 'overlooked or misconceived material and relevant evidence [relating] to a critical issue in the case.'" Id. at 141 (quoting State v. Bolduc, 822 A.2d 184, 187 (R.I. 2003)). "We employ this deferential standard of review with respect to a motion for a new trial because a trial justice, being present during all phases

of the trial, is in an especially good position to evaluate the facts and to judge the credibility of the witnesses." Id.

Here, the trial justice determined that there was sufficient evidence supporting defendant's convictions. The trial justice independently considered the evidence proffered against defendant and determined that the state's key witnesses were Boswell and Regis. The trial justice then distilled the issue surrounding their testimony as one of credibility. The trial justice then focused on Boswell's testimony: Boswell testified that he saw his "very good friend" nearly empty an extended magazine into a car and leave two dead and one seriously injured, and that defendant had stated on their ride back to Boston "that he left three of them slumped," which, the trial justice noted, was "precisely how the two [deceased victims] appeared." The trial justice continued by indicating that Boswell was "severely cross-examined" by defendant with respect to his prior inconsistent statements and the cooperation agreement made in connection with his testimony. The trial justice then determined that "[i]t [was] plain that the jury accepted * * * Boswell's incriminating testimony, warts and all" and noted that, frankly, he, too, "found [Boswell's] trial testimony compelling."

The trial justice then directed his attention to Regis's testimony. He indicated that "after several starts and stops and, obviously, false professed lapses of memory, [Regis] eventually conceded that she had told the police early on that she saw [defendant] with the gun in his hand." The trial justice then determined that the jury must have decided that Regis's "professed amnesia" was not real and that "her prior statements to the police and the Grand Jury, * * * when pieced together, reflected her actual and true full recollection of the events."

In dismissing the motion for a new trial, the trial justice indicated that he was "satisfied that th[e] jury properly adjudicated the case and did justice to the evidence which was presented." We conclude that the trial justice articulated sufficient reasoning and did not overlook or misconceive any critical issue relating to the testimony proffered by the state when he found that there was sufficient evidence to support a conviction of first-degree murder.

## IV

## Conclusion

For the reasons stated herein, we affirm the judgment of the Superior Court. The record of this case shall be returned to the Superior Court.

STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Nigel Nichols. |
| **Case Number** | SU-15-0238-C.A. (P1/13-2586AG) |
| **Date Opinion Filed** | March 24, 2017 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Robert D. Krause |
| **Attorney(s) on Appeal** | For State: <br><br> Aaron L. Weisman <br> Department of Attorney General <br><br> For Defendant: <br><br> Michael S. Pezzulo, Esq. |